EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. Aníbal Acevedo Vilá Y Otros<br><br>        Peticionarios<br><br>             v.<br><br>José E. Meléndez Ortiz<br><br>        Recurrido | 2005 TSPR 79<br><br>164 DPR ____ |

Número del Caso: MD-2005-4

Fecha: 7 de junio de 2005

 Abogados del Peticionario:

                        Lcdo. Pedro E. Ortiz Álvarez
                        Lcda. Johanna Emmanuelli Huertas
                        Lcdo. Jorge Martínez Luciano
                        Lcdo. Andrew Jiménez Cancel
                        Lcdo. Fernando L. Torres Ramírez

Abogados del Recurrido:

                        Lcdo. Richard W. Markus
                        Lcdo. Manuel D. Herrero
                        Lcdo. Carlos E. Pérez Acosta

Jurisdicción Original:

                        Mandamus

Materia: Derecho Constitucional: Cuestión Política,
        Legitimación Activa de Legisladores

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá y
otros

     Peticionarios

        v.                    MD-2005-4      Mandamus

José Enrique Meléndez Ortiz

     Recurrido

Opinión del Tribunal emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico, a 7 de junio de 2005.

El Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Aníbal Acevedo Vilá, la Secretaria de Estado nominada, Hon. Marisara Pont Marchese y el Portavoz de la Minoría del Partido Popular Democrático en la Cámara de Representantes de Puerto Rico, Hon. Héctor Ferrer Ríos, comparecen ante nos mediante la presente petición de *Mandamus*. En esencia, solicitan nuestra intervención para que ordenemos al Secretario de la Cámara de Representantes, Lcdo. José Enrique Meléndez Ortiz, certificar que, conforme a la votación que tuvo lugar en la Sesión celebrada el 9 de mayo de 2005 en dicho cuerpo legislativo, la señora Pont Marchese fue

confirmada como Secretaria de Estado. Luego de evaluar con detenimiento los hechos particulares de este caso y el derecho aplicable, en deferencia al ejercicio de los poderes constitucionales que le asisten a la Cámara de Representantes y en vista de que no se encuentran aquí presentes circunstancias que ameritan nuestra intervención, declinamos emitir el auto de *mandamus* solicitado.

I

El pasado 2 de enero de 2005, el Hon. Aníbal Acevedo Vilá tomó posesión del cargo como primer ejecutivo del Estado Libre Asociado de Puerto Rico. Éste, haciendo uso de sus facultades constitucionales, designó a la señora Pont Marchese como Secretaria del Departamento de Estado. A tenor con lo dispuesto por el Art. IV, Sec. 5 de nuestra Constitución, 1 L.P.R.A., dicha nominación fue referida a la Asamblea Legislativa para el consejo y consentimiento de ambas cámaras legislativas.

El Senado de Puerto Rico, luego del proceso de votación (26 votos a favor, 1 voto en contra), certificó su consentimiento para la designación de la señora Pont Marchese como Secretaria de Estado. Restaba, por tanto, que la nominada fuera evaluada por la Cámara de Representantes.

La confirmación de la señora Pont Marchese como Secretaria de Estado fue traída a la consideración de la Cámara de Representantes durante la Sesión celebrada el

9 de mayo de 2005, luego que la Comisión de Gobierno del referido cuerpo sometiera un informe favorable a la nominada. Según se desprende de la transcripción de dicha Sesión, la primera votación se celebró a viva voz. Acto seguido, el representante Hon. Víctor García San Inocencio informó que la votación tenía que llevarse a cabo por lista y no verbalmente. Dicho pedido fue secundado por el representante Hon. Héctor Ferrer Ríos, quien indicó que, conforme al Reglamento de la Cámara de Representantes, los nombramientos eran considerados mediante votación por lista.

Por tal razón, se procedió a celebrar una votación por lista que resultó en 24 votos a favor de la nominada y 16 votos en contra. El Presidente de la Cámara de Representantes, Hon. José Aponte Hernández, declaró que la señora Pont Marchese no fue confirmada por no contar ésta con el respaldo de una mayoría absoluta del cuerpo. Ante el planteamiento del Hon. Héctor Ferrer Ríos de que se requería una mayoría simple para la confirmación del nombramiento, el Presidente del cuerpo reiteró su criterio, por lo que sostuvo que la señora Pont Marchese no fue confirmada como Secretaria de Estado.

Posteriormente, durante la misma Sesión, el representante Hon. Luis Pérez Ortiz solicitó la reconsideración de la votación sobre el nombramiento de la señora Pont Marchese. El pedido fue secundado por cinco representantes. Además, dicha solicitud fue aprobada por

el cuerpo en votación a viva voz. El representante Hon. Carlos Vizcarrondo Irizarry expuso que la solicitud de reconsideración debía levantarla un representante que hubiese votado con la mayoría, a lo que respondió el Presidente del cuerpo que el Hon. Luis Pérez Ortiz había votado a favor de la confirmación. En vista de ello, se procedió a celebrar la votación por lista en reconsideración. La misma obtuvo el resultado de 20 votos a favor de la nominada y 22 votos en contra, por lo que el Presidente de la Cámara de Representantes declaró que la señora Pont Marchese no había sido confirmada como Secretaria de Estado. Conforme a lo anterior, ese mismo día, el Secretario de la Cámara de Representantes emitió una certificación mediante la cual comunicó al Gobernador que dicho cuerpo legislativo no prestó su consentimiento a la designación de la señora Pont Marchese como Secretaria del Departamento de Estado de Puerto Rico.

Al día siguiente, los peticionarios presentaron el recurso de autos para cuestionar la validez de dicha certificación. Aducen que la señora Pont Marchese fue confirmada por la mayoría de los representantes presentes en una votación válida y, que fue luego de una reconsideración irregular de dicha votación, que la Cámara de Representantes no confirmó a la nominada.[1] Solicitan,

---

[1] Argumentan que en la votación en reconsideración, los representantes Hon. Francisco González Rodríguez y Hon. Bernardo Márquez García emitieron sus votos bajo la

**(Continúa . . .)**

por tanto, que se considere como válida la votación por lista inicial y, en consecuencia, expidamos el auto de *mandamus* para ordenar al licenciado Meléndez Ortiz que certifique la confirmación de la señora Pont Marchese como Secretaria de Estado.

Vista la petición, ordenamos a los peticionarios que emplazaran al Secretario de la Cámara de Representantes y concedimos término simultáneo, contado a partir del emplazamiento, para que las partes presentaran sus posiciones. Además, ordenamos al Secretario de la Cámara que presentara copia de la transcripción y de la grabación de la sesión celebrada el 9 de mayo de 2005 en la Cámara de Representantes. Finalmente, concedimos a las partes un término simultáneo para que presentaran una réplica, de entenderlo necesario. Con el beneficio de las comparecencias de las partes y de la aludida transcripción y grabación, procedemos a resolver el recurso con la rapidez que este asunto requiere.

II

Nuestro sistema republicano de gobierno, que emana del Art. I, Sec. 2 de nuestra Constitución, está compuesto por tres poderes claramente encomendados a tres ramas distintas y separadas:

_____

premisa equivocada de que el asunto a dilucidarse era la procedencia de la reconsideración y no la reconsideración misma de la confirmación de la señora Pont Marchese. Los representantes González Rodríguez y Márquez García no se han unido a la acción presentada por el Hon. Héctor Ferrer Ríos.

El gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico. Documentos Históricos, 1 L.P.R.A.

Esta separación de poderes entre las tres ramas responde a dos criterios, a saber: (1) se protege la libertad de los ciudadanos, pues el poder no se concentra en una de ellas y (2) se salvaguarda la independencia de cada rama del gobierno, toda vez que se evita que una de ellas domine o interfiera con el poder de las otras. Colón Cortés v. Pesquera, 150 D.P.R. 724, 750 (2000). No obstante, esta división de poderes no significa que cada una de las tres ramas del gobierno deba desempeñarse con entera abstracción de las demás. Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 89 (1998). Por el contrario, se aspiró a crear un sistema de pesos y contrapesos, "con el propósito de generar un equilibrio dinámico entre poderes coordinados y de igual rango, y evitar así que ninguno de éstos amplíe su autoridad a expensas de otro". Id.

Respecto a la interacción que debe existir entre las tres ramas del gobierno para alcanzar el propósito que persigue la separación de poderes, este Tribunal ha expresado lo siguiente:

La relación entre los poderes del Gobierno debe ser una dinámica y armoniosa. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdurabilidad requiere que cuando haya un conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y deferencia

para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias. <u>Sánchez v. Secretario de Justicia</u>, res. el 28 de junio de 2002, 2002 TSPR 98, *citando a* <u>Silva v. Hernández Agosto</u>, 118 D.P.R. 45 (1986).

Como surge de lo anterior, cuando haya un conflicto entre la Rama Ejecutiva y la Rama Legislativa, le corresponde a la Rama Judicial interpretar las disposiciones constitucionales y proveer un foro para dilucidar la controversia, toda vez que el Poder Judicial es el último intérprete de la Constitución y de las leyes. <u>Colón Cortés v. Pesquera</u>, *supra*; <u>Silva v. Hernández Agosto</u>, *supra*; <u>Santa Aponte v. Ferré Aguayo</u>, 105 D.P.R. 750 (1977). Es decir, "nuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos". <u>Silva v. Hernández Agosto</u>, *supra*, pág. 760.

Sin embargo, al ejercitar ese poder, debemos ser conscientes de que la interpretación inicial que de la Constitución haga otra rama merece deferencia.[2] <u>Noriega Rodríguez v. Jarabo</u>, 136 D.P.R. 497 (1994); *Id.* A fin de cuentas, los funcionarios que dirigen y laboran en dichas ramas políticas también se obligaron bajo juramento a cumplir fielmente con nuestra Constitución y pueden formular sus propias conclusiones respecto a ella, en ausencia de una expresión nuestra sobre cierta

---

[2] Ello no significa que este Tribunal claudique a su deber de interpretar finalmente la Constitución. No obstante, nuestra intervención debe estar revestida de prudencia.

interpretación constitucional. *Véase* L. Tribe, *American Constitutional Law*, 3rd ed., Vol. I, 2000, Sec. 5-1, pág. 795.

**Por otro lado, dicho ordenamiento constitucional requiere que las tres ramas reconozcan y respeten los ámbitos constitucionales de cada una. Así pues, la deferencia judicial que le concedemos a la Rama Legislativa y a la Rama Ejecutiva tiene como corolario necesario que ellas también tengan la misma deferencia hacia los poderes conferidos por nuestra Constitución a la Rama Judicial, para así evitar que se menoscabe el sistema republicano de gobierno.**

### III

Conscientes de este ordenamiento constitucional, este Tribunal, al igual que el Tribunal Supremo de los Estados Unidos, ha desarrollado una doctrina de autolimitación judicial cuando surgen conflictos entre Ramas, basada en el concepto de justiciabilidad. *Véase* L. Tribe, *supra*, Sec. 3-14, págs. 387-391. Conforme a dicha doctrina, un caso no es justiciable cuando se presenta una cuestión política o una de las partes carece de legitimación activa para promover un pleito.

Estas limitaciones al Poder judicial descansan en dos premisas: (1) que los tribunales únicamente pueden resolver asuntos que surgen de un contexto adversativo capaz de ser resuelto judicialmente y, más pertinente para el caso de autos, (2) que la Rama Judicial no intervendrá,

prudencialmente, en áreas reservadas a otras ramas del gobierno, restricción inherente a la división tripartita de nuestro sistema republicano. Noriega v. Hernández Colón, 135 D.P.R. 406 (1995).

Una de las doctrinas derivadas de este enfoque prudencial, denominada legitimación activa ("standing"), cumple con el propósito de asegurar al tribunal que la parte promovente tenga un interés de magnitud suficiente para, con toda probabilidad, motivarlo a proseguir su causa de acción vigorosamente. Hernández Torres v. Gobernador, 129 D.P.R. 824 (1992). En ausencia de legislación que la conceda, hay legitimación activa cuando: (1) la parte que reclama ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre la acción que se ejecuta y el daño alegado y (4) la causa de acción surge al amparo de la Constitución o de alguna ley. Id.; P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995); Hernández Torres v. Hernández Colón, 131 D.P.R. 593 (1992); Hernández Agosto v. Romero Barceló, 112 D.P.R. 407 (1982).

En el caso específico de los legisladores, hemos reconocido acciones legitimadas en varias ocasiones. Así lo hicimos ante una controversia sobre la elegibilidad de un legislador para ocupar un escaño legislativo. Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977). También lo hemos hecho cuando alguna de las Cámaras ha autorizado

a uno o varios legisladores a vindicar derechos y prerrogativas de dicha Cámara, Hernández Agosto v. Romero Barceló, *supra*; al cuestionarse ciertas reglas que coartaban el derecho constitucional a participar en los procedimientos celebrados en las comisiones del Senado, Silva v. Hernández Agosto, *supra*; cuando un legislador se ve afectado directamente en su carácter personal por acciones gubernamentales, Noriega v. Gobernador, 122 D.P.R. 650 (1988) y ante el reclamo de inconstitucionalidad de una regla interna del cuerpo que impedía registrar la abstención de los legisladores en una votación, Noriega Rodríguez v. Jarabo, *supra*, entre otras.

Particularmente, en Silva v. Hernández Agosto, *supra*, reconocimos legitimación activa a varios senadores de la minoría que impugnaron la validez constitucional de una regla que regía los procedimientos investigativos de la Comisión de lo Jurídico del Senado. Al aplicar la regla impugnada, estos senadores resultaron excluidos de unas reuniones investigativas que celebró la Comisión. En vista de la lesión constitucional que producía el impedir a los senadores de minoría ejercer sus prerrogativas legislativas en los procesos investigativos y deliberativos de la Comisión, y tomando en consideración otros factores, determinamos que la controversia era justiciable.

Ahora bien, hemos resuelto que un legislador no tiene legitimación activa para demandar en representación de sus

votantes o del interés público, Hernández Torres v. Gobernador, *supra*, ni bajo el pretexto de que se le han afectado sus prerrogativas al no permitírsele fiscalizar la obra legislativa, cuando se le ha dado participación en los procesos legislativos. Hernández Torres v. Hernández Colón, *supra*.

En todo caso, el legislador tendrá que demostrar la existencia de los requisitos establecidos en la doctrina para que se le reconozca su legitimación. *Id.* Así, evitamos que el senador o representante traslade al foro judicial --en búsqueda de una segunda oportunidad-- su intento fallido de lograr cierto resultado en un proceso legislativo válido, hecho que trastocaría la separación de poderes. Noriega v. Hernández Colón, *supra*.

IV

¿Tienen legitimación activa ("standing") los peticionarios en el presente caso?

Respecto al Hon. Héctor Ferrer Ríos, --único de los peticionarios que es miembro de la Cámara de Representantes-- éste no ha alegado que en el caso particular ante nuestra consideración se le hayan lesionado sus derechos y prerrogativas constitucionales como legislador durante el proceso aludido. Además, de la transcripción de la sesión celebrada el 9 de mayo de 2005 en la cámara baja se desprende que el Representante Ferrer Ríos tuvo su oportunidad de votar y de debatir sus planteamientos en el Hemiciclo. Tampoco se limitó su

intervención en el proceso de confirmación de la nominada. Finalmente, ni siquiera se alega que se le haya privado de los derechos que corresponden a la minoría legislativa, según nuestra Constitución. *Véase* Silva v. Hernández Agosto, *supra*.

Por otra parte, no procede considerar sus alegaciones en torno al cómputo de los votos emitidos por los representantes González Rodríguez y Márquez García, toda vez que éstos no han comparecido a este Tribunal a reclamar que se le violaron sus prerrogativas legislativas. De hecho, el Hon. Héctor Ferrer Ríos no alega que represente a estos terceros o que los mencionados representantes no puedan hacer valer sus propias facultades legislativas, por lo que necesitan de un tercero para vindicarlas. *Véase*, E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394 (1983).

Por tanto, es nuestro criterio que en el caso de autos el mencionado representante no ha manifestado haber sufrido daños claros y palpables, ya sea en su carácter personal o como legislador. Sencillamente, no nos ha convencido de que "no se trata de un traslado del debate legislativo al foro judicial y sí de una verdadera lesión a sus prerrogativas legislativas". Hernández Torres v. Hernández Colón, *supra*, pág. 601.

En cuanto a los restantes peticionarios, la señora Marisara Pont Marchese no ha expuesto un daño claro y palpable más allá de la pérdida de su expectativa y de su

deseo de servir a Puerto Rico como la Secretaria del Departamento de Estado. Independientemente de los méritos de su nominación por el Gobernador, la señora Pont Marchese no tiene un derecho sobre dicho cargo precisamente porque no ha sido confirmada por ambas cámaras, según lo requiere el Art. IV, Sec. 5 de nuestra Constitución. Tampoco se han expedido las correspondientes credenciales ni ha prestado su juramento una vez nombrada, como ocurrió en el caso de U.S. v. Smith, 286 U.S. 6 (1932). En vista de ello, este Tribunal no puede confeccionar un remedio judicial que no conlleve una intromisión indebida en el poder legislativo.

Por último, en cuanto al Hon. Aníbal Acevedo Vilá, aun cuando reconocemos su facultad para acudir en casos apropiados al cauce judicial con el fin de vindicar sus prerrogativas constitucionales, entendemos que en este caso no se ha alegado y menos establecido de qué manera la ausencia de confirmación de la señora Pont Marchese como Secretaria de Estado ha violentado sus facultades ejecutivas constitucionales. El Hon. Aníbal Acevedo Vilá ha sufrido la pérdida de una nominada a su gabinete por falta de confirmación, sin embargo, ello es consecuencia del sistema de pesos y contrapesos que es intrínseco a la separación de poderes de nuestro ordenamiento constitucional.

En Hernández Agosto v. López Nieves, 114 D.P.R. 601, 620 (1983) indicamos claramente, respecto a la facultad de

nombramiento del Gobernador y en atención precisamente a la doctrina de separación de poderes, que "la Rama Ejecutiva no puede despojar a la Rama Legislativa del poder de confirmación que le confiere la Constitución y las leyes. Tampoco puede el Senado o la Rama Legislativa usurpar el poder de nominación del señor Gobernador mediante afirmaciones indicativas de que confirmará únicamente a determinado candidato".

Sin embargo, en la petición de *mandamus* presentada ante esta Curia, el Gobernador no alega que la falta de confirmación de la señora Pont Marchese constituya una usurpación de su poder constitucional de nominación, ni que lo ocurrido demuestre que la Cámara de Representantes intenta de esta manera que se nomine a un candidato determinado. El Gobernador, de hecho, ejerció su poder al nominar a la señora Pont Marchese y, a su vez, la Cámara de Representantes descargó su obligación constitucional.

Además, en la petición de *mandamus*, lo único que el Gobernador argumenta se limita a cuestionar el procedimiento y el Reglamento utilizado por la Cámara de Representantes en la votación sobre la confirmación de la señora Pont Marchese. En ninguna parte de su petición expone cuál es el daño específico que la actuación legislativa inflige en sus facultades constitucionales como Gobernador.

En vista de lo anterior, concluimos que no están presentes en este caso las condiciones necesarias para nuestra intervención mediante el auto solicitado.

V

La conclusión a la que llegamos, de ordinario, sería suficiente para disponer del caso, esto es, para denegar la petición del *mandamus* presentada. Ello por razón de que si los peticionarios no tienen acción legitimada, prudencialmente nos abstendríamos, como regla general, de entender en los méritos del mismo.

**Ahora bien, y con el propósito de que no quede duda en la mente de persona alguna sobre la validez de los actos de la Cámara de Representantes en una controversia de tanta importancia pública como la de autos, aun aceptando --a los fines de la argumentación-- que los peticionarios tuvieran acción legitimada ("standing") para instar el recurso de *mandamus*, <u>el resultado sería el mismo</u>. Veamos.**

Así como se le delegó a este Tribunal Supremo la facultad para determinar la constitucionalidad de un acto, Art. V., Sec. 4, Const. E.L.A., 1 L.P.R.A., la Constitución autorizó a cada cámara que compone nuestra Asamblea Legislativa a "adoptar[] las reglas propias de

cuerpos legislativos para sus procedimientos y gobierno interno".[3] Art. III, Sec. 9, Const. E.L.A., 1 L.P.R.A.

Examinemos, en primer lugar, la manera en que se relacionan estos poderes delegados y determinemos cuándo procede, como norma general, la intervención judicial con las reglas de procedimientos internos de la Rama Legislativa y su aplicación.

Aun cuando hemos interpretado la Sec. 9 del Art. III de nuestra Constitución, en pocas instancias nos hemos referido a la facultad de la Rama Legislativa de adoptar sus propias reglas y procedimientos. Así, en Silva v. Hernández Agosto, *supra*, expresamos que los cuerpos legislativos pueden adoptar reglas de gobierno interno como corolario de su poder inherente de controlar sus procedimientos. No obstante, aclaramos que la Asamblea Legislativa y sus comisiones no podían obviar e ignorar las limitaciones constitucionales al ejercer su función de reglamentar.

El alcance de esta sección fue discutido con mayor detenimiento en Noriega Rodríguez v. Jarabo, *supra*. En ese caso, dos representantes atacaron la constitucionalidad de

---

[3] Anteriormente, se le había otorgado a la entonces Cámara de Delegados la facultad de ejercer las mismas atribuciones que usualmente le competían a los cuerpos legislativos parlamentarios, respecto a la dirección de sus procedimientos. Acta Foraker, Sec. 30, Documentos Históricos, 1 L.P.R.A. Dicha autoridad le fue reiterada al Senado y a la Cámara de Representantes de Puerto Rico mediante la Sec. 32 del Acta Jones, Documentos Históricos, 1 L.P.R.A.

una regla interna de la Cámara de Representantes que regulaba el procedimiento para abstenerse durante una votación cameral. Luego de reiterar la doctrina esbozada en Silva v. Hernández Agosto, *supra*, expresamos la importancia que revisten las reglas internas legislativas como instrumentos y herramientas de trabajo, necesarias para determinar en forma ordenada la voluntad de la mayoría. Reconocimos, además, que cada cuerpo legislativo está en posición óptima para adoptar o interpretar sus propias reglas de gobierno interno, toda vez que la Asamblea Legislativa tiene, de ordinario, amplia discreción para decidir en qué forma lleva sus procedimientos y cumple con los requisitos constitucionales.

De lo anterior resulta claro que en nuestra jurisdicción hemos acogido la doctrina de deferencia judicial hacia la adopción e interpretación por parte de las cámaras legislativas de sus reglas y procedimientos. En la medida que dichas reglas estén dentro de los parámetros de los poderes delegados, los tribunales no pasarán juicio, de ordinario, sobre las interpretaciones o la aplicación de éstas por el cuerpo legislativo. Noriega Rodríguez v. Jarabo, *supra.* Después de todo, debemos presumir que los procesos legislativos se celebran dentro de un marco de legalidad. *Mason´s Manual of Legislative Procedures*, Ed. 2000, Sec. 73(8), pág. 65. Sin embargo, ello no significa que dichos procesos y reglamentos sean

inmunes a una intervención judicial, pues este foro no puede ceder su responsabilidad de determinar, en última instancia, si tales actos legislativos se encuentran enmarcados en sus poderes constitucionales.

A modo ilustrativo y comparativo, encontramos que los tribunales federales han abordado cuestionamientos sobre procedimientos legislativos, y la aplicación e interpretación de las reglas que lo regulan, con marcada deferencia.

La Constitución de los Estados Unidos en su Art. I, Sec. 5, cl. 2, estableció que cada cámara legislativa puede determinar las reglas para regir sus procedimientos. U.S.C.A. Const. Art. I, Sec. 5, cl. 2; 1 L.P.R.A. En U.S. V. Ballin *et al.*, 144 U.S. 1 (1891), el Tribunal Supremo Federal tuvo la oportunidad de interpretar el alcance de esta disposición constitucional. En dicho caso, el más alto foro judicial federal estableció los parámetros que regirían la revisión judicial ante el cuestionamiento de la validez de una regla interna promulgada por la Cámara de Representantes en cuanto al método de determinar y registrar la presencia de *quórum* en dicho cuerpo. Allí se expresó:

> Neither do the advantages or disadvantages, the wisdom or folly, of such a rule present any matters for judicial consideration. With the courts the question is only one of power. The constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding

established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of the house[. . .] *Id.*, pág. 5.

Asimismo, se ha resuelto que los tribunales darán gran peso a la interpretación que de sus propias reglas realice cada cámara, aunque la misma no será concluyente. U.S. v. Smith, *supra.* Además, algunos tribunales han determinado que cuando las reglas resulten ambiguas, bajo ciertas circunstancias no se aconseja la intervención judicial. U.S. v. Rostenkowski, 59 F. 3d 1291 (D.C. Cir. 1995); Texas Ass'n of Concerned Taxpayers v. U.S., 772 F. 2d 167 (5th Cir. 1985).

Igualmente, se ha establecido que aun cuando no existe una prohibición absoluta a la revisión judicial de los procedimientos legislativos, Cable News Network v. Anderson, 723 F. Supp. 835 (D.C. 1989), ello no significa que los tribunales tengan la obligación de intervenir cada vez que se les presenta alguna controversia relacionada a estos procesos. Guy Vander Jagt v. O'Neill, 699 F. 2d 1166 (D.C. Cir. 1983). En otras palabras, hay que distinguir entre la existencia del poder para intervenir y cuándo es prudente ejercerlo. *Id.*

Pasamos a exponer los procedimientos que establece el Reglamento de la Cámara de Representantes de Puerto Rico para la consideración y determinación de los nombramientos sometidos por el Gobernador a dicho cuerpo.

VI

Mediante Resolución fechada el 2 de enero de 2005, R. de la C. 1, la Cámara de Representantes del Estado Libre Asociado de Puerto Rico aprobó el Reglamento que regirá los procedimientos internos de dicho cuerpo legislativo durante el cuatrienio 2005-2008 (en adelante el Reglamento). La Sección 1.5 del Reglamento preceptúa, en parte que:

> El Presidente será responsable del cumplimiento de las disposiciones de este Reglamento. A tales fines, tendrá facultad para su interpretación y la responsabilidad de su aplicación de forma justa y razonable, tomando en consideración el orden, la dignidad e integridad de la Cámara y de sus procedimientos.

En lo pertinente al caso que nos ocupa, la Regla 45 del Reglamento establece las pautas que han de seguirse cuando lo que se considera es la confirmación de nombramientos. En la Sección 45.4 se dispone que la votación a esos efectos será por lista. Culminado el proceso, el Secretario de la Cámara de Representantes notificará al Gobernador la determinación del cuerpo. No obstante, dicha notificación no se efectuará hasta tanto haya expirado el plazo para solicitar la reconsideración del asunto.

Conforme a la Regla 40 del aludido reglamento, cualquier Representante podrá solicitar la reconsideración de un asunto ya resuelto, <u>siempre que dicha solicitud se haga en la misma Sesión</u> en la que se consideró el asunto o en el siguiente día de Sesión. La reconsideración se podrá

plantear en una sola ocasión. Además, se requiere que la solicitud a tales efectos sea debidamente secundada. Sin embargo, cuando la votación se lleve a cabo por lista, sólo podrá solicitar la reconsideración un representante que, mediante su voto, fuese parte del grupo que obtuvo la mayoría en dicha votación.

Evaluemos lo sucedido en la Cámara de Representantes a la luz de estas disposiciones reglamentarias.

## VII

Luego de estudiar con detenimiento la transcripción y la grabación de la sesión celebrada el 9 de mayo de 2005 en la Cámara de Representantes, concluimos que el proceso de consideración de la nominación de la señora Pont Marchese se ajustó a los parámetros reglamentarios aludidos. La primera votación celebrada fue a viva voz, no obstante se anuló porque no cumplió con el requisito reglamentario que exigía una votación por lista. La segunda votación se celebró por lista. Un legislador que había votado en el grupo mayoritario solicitó la reconsideración dentro de la misma Sesión. Dicho pedido fue secundado por cinco representantes. El asunto de la reconsideración, aún así, fue presentado ante el cuerpo, que decidió a viva voz reconsiderar la votación inicial. Esta segunda votación en reconsideración se llevó a cabo por lista y su resultado produjo que la nominada no fuera confirmada.

Considerando lo anterior y evaluando las contenciones expuestas en la petición, en su justa perspectiva, resulta claro que el remedio que se pretende alcanzar, en última instancia, es que este Tribunal imponga una determinación legislativa que no obtuvo la aprobación del cuerpo. Los peticionarios alegan que la señora Pont Marchese fue confirmada por la mayoría de los presentes (24 votos a favor, 16 votos en contra) en una votación válida por lista, por lo que procede que se le certifique tal resultado al Gobernador. No obstante, dicha votación fue objeto de reconsideración, en la cual la señora Pont Marchase no resultó confirmada (20 votos a favor, 22 votos en contra).[4] Esta última votación se convirtió en la determinación de la Cámara de Representantes para todos los efectos,[5] y así fue certificado al Gobernador por el licenciado Meléndez Ortiz, Secretario del cuerpo legislativo. En vista de que hay una votación final en reconsideración en contra de la designación de la señora Pont Marchese, es improcedente la solicitud de los peticionarios.

---

[4] Según Mason´s Manual of Legislative Procedures, *supra*, Sec. 751(3), pág. 538, "[w]here the original vote was to approve an appointment [of the Governor], the subsequent vote of reconsideration had the effect of disapproving the appointment".

[5] Habida cuenta que la mayoría del cuerpo legislativo voto en reconsideración contra la designación de la señora Pont Marchese, no emitiremos opinión sobre qué mayoría, absoluta o simple, se requiere para la confirmación de nombramientos.

Por otro lado, en lo que respecta al argumento de los peticionarios de que a los representantes Hon. Francisco González Rodríguez y Hon. Bernardo Márquez García se les contó su voto como en contra de la nominada cuando en realidad votaron en contra de la reconsideración, es necesario recalcar que dichos legisladores no solicitaron a tiempo que sus votos fueran adjudicados a favor de la señora Pont Marchese ni acudieron a los tribunales a cuestionar el resultado de la votación emitida en reconsideración. Surge de la transcripción que la Cámara de Representantes había votado a viva voz a favor de reconsiderar la nominación de la señora Pont Marchese, luego de que fuera debidamente secundada la moción. Por tanto, este asunto fue adjudicado antes de que estos dos representantes emitieran sus votos por lista. En esas circunstancias, correspondía a los dos legisladores acudir a los tribunales a impugnar la votación si entendían que se habían violado sus prerrogativas legislativas. Sin embargo, ellos ni se unieron al recurso presentado por los peticionarios ni radicaron acciones separadas. En ausencia de algún recurso presentado por estos dos representantes, cualquier decisión nuestra adjudicando sus votos de otra manera, como pretenden los peticionarios, sería no solamente improcedente e imprudente, sino también una intromisión indebida en los procesos que se celebran en la Cámara.

Antes de concluir, este caso amerita que destaquemos nuestras expresiones en <u>Noriega Rodríguez v. Jarabo</u>, *supra*, a las págs. 533-534:

> **[No] podemos convertirnos en árbitros de todas las disputas internas que tienen los legisladores sobre la interpretación y aplicación de reglas legislativas relativas a procedimientos puramente parlamentarios. Sin embargo, no estamos abdicando a nuestra facultad de ser los máximos intérpretes de las actuaciones legislativas. Dicha facultad la ejerceremos cuando las actuaciones de otras ramas de gobierno presenten claros problemas de constitucionalidad y no meras disputas procesales o interpretativas. No podemos trasladar al foro judicial las controversias internas de las ramas legislativas, que son producto de las discrepancias entre los legisladores, surgidas a través del proceso normal y usual del debate legislativo.**
> (Énfasis suplido).

Por los fundamentos que anteceden, se deniega el auto de *Mandamus*.

Se dictará Sentencia de conformidad.


                              Federico Hernández Denton
                                   Juez Presidente

MD-2005-4

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá y
otros

    Peticionarios

       v.                     MD-2005-4      Mandamus

José Enrique Meléndez Ortiz

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 7 de junio de 2005.

       Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integral de la presente, se deniega el auto de *Mandamus* solicitado.

       Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez emitió Opinión de Conformidad y Concurrente. El Juez Asociado señor Fuster Berlingeri emitió Opinión Disidente.

                   Aida Ileana Oquendo Graulau
                   Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá, et
als

      Peticionarios

         v.                  MD-2005-4

José Enrique Meléndez Ortiz,
en su capacidad oficial como
Secretario de la Cámara de
Representantes

      Recurridos

**Opinión de Conformidad y Concurrente emitida por el Juez Asociado señor Rivera Pérez.**

San Juan, Puerto Rico, a 7 de junio de 2005.

Los peticionarios, Honorable Aníbal Acevedo Vilá, en su capacidad oficial como Gobernador de Puerto Rico, la señora Marisara Pont Marchese, en su alegada capacidad oficial como Secretaria de Estado de Puerto Rico y el Honorable Héctor Ferrer Ríos, en su capacidad oficial como portavoz de la minoría del Partido Popular Democrático en la Cámara de Representantes de Puerto Rico; presentaron ante este Tribunal un recurso extraordinario de mandamus, en jurisdicción original, contra el licenciado José Enrique Meléndez Ortiz, en su capacidad oficial como Secretario de la Cámara de Representantes. La parte

peticionaria pretende que este Tribunal expida el auto de mandamus solicitado y ordene al señor José Enrique Meléndez Ortiz, Secretario de la Cámara de Representantes, como un deber ministerial dispuesto por ley, a expedir una certificación que refleje el consentimiento de ese cuerpo, alegadamente por mayoría de votos, a la nominación, por el Gobernador de Puerto Rico, de la Honorable Marisara Pont Marchese como Secretaria de Estado.

Denegamos, mediante Opinión, el auto de mandamus solicitado. Estamos conforme con tal curso de acción y sus fundamentos. No obstante, creo que la consideración y análisis sobre la validez de lo actuado por la Cámara de Representantes no debe ser atendido separadamente por ser parte integral del criterio y fundamentos que sostienen la referida denegatoria. Con relación a esto último concurrimos.

I

El 9 de mayo de 2005, la Cámara de Representantes de Puerto Rico consideró en pleno, durante la celebración de su sesión ordinaria, la nominación de la Honorable Marisara Pont Marchese como Secretaria de Estado de Puerto Rico. Dicha sesión contaba con el quórum requerido para realizar el trámite legislativo correspondiente. Se realizó una primera votación por el Cuerpo y el resultado fue de veinte y cuatro (24) votos a favor del consentimiento a la nominación y de dieciséis (16) votos en contra. La

votación de los legisladores fue emitida por lista. Inmediatamente después el Honorable José Aponte Hernández, Presidente de la Cámara de Representantes de Puerto Rico, opinó que el consentimiento a la referida nominación no había sido producido por una mayoría absoluta de los miembros del Cuerpo. Luego de una reunión de los miembros de la mayoría parlamentaria del Partido Nuevo Progresista, ese mismo día, el Honorable Luis Pérez Ortiz, Representante a la Cámara por ese partido, quien había votado a favor del consentimiento en la votación original, solicitó una nueva votación, en reconsideración. Se realizó una segunda votación por el Cuerpo, en reconsideración, y el resultado fue de veintidós (22) votos en contra al consentimiento a la nominación y veinte (20) votos a favor. El Secretario de la Cámara de Representantes de Puerto Rico le envió una carta el 9 de mayo de 2005 al Gobernador de Puerto Rico, a tenor con la Regla 45.5 del reglamento de ese cuerpo, informándole que ese mismo día el Cuerpo no había prestado su consentimiento a la referida nominación, a tenor con el Artículo IV, Sección 5 de la Constitución de Puerto Rico.[6]

---

[6] **Const. E.L.A., Art. IV, Sec. 5, 1 L.P.R.A.** La referida disposición constitucional lee de la forma siguiente:

> **Para el ejercicio del Poder Ejecutivo el Gobernador estará asistido de Secretarios de Gobierno que nombrará con el consejo y consentimiento del Senado. El nombramiento del Secretario de Estado requerirá, además, el consejo y consentimiento de la Cámara de Representantes,** y la persona nombrada deberá reunir los requisitos establecidos en la Sección 3 de éste Artículo. Los Secretarios
>
> **(Continúa . . .)**

La parte peticionaria alega que luego de la segunda votación, en reconsideración, los legisladores, Honorable Francisco González y Honorable Bernardo Vázquez, miembros de la mayoría parlamentaria, aclararon **"que al votar entendían que estaban votando en contra de la reconsideración del resultado original, no de la confirmación de la nominada"**. Aduce que ello significa que esos legisladores de mayoría estaban votando en la segunda votación a favor de la nominada. Alega que el Presidente de la Cámara de Representantes resolvió que la intención de esos dos (2) legisladores no era relevante, sino el voto efectivamente contabilizado y anunciado. **Arguye que, al así actuar, obvió la prerrogativa constitucional de esos dos (2) legisladores pues no se aseguró que su voto fuera correctamente adjudicado. Sostiene que como resultado se consignó en el récord legislativo de la Cámara de Representantes un resultado que no correspondía a la mayoría de los presentes. Alega que el Presidente del Cuerpo hizo caso omiso a los planteamientos levantados, como cuestión de orden, por el portavoz de la minoría parlamentaria del Partido Popular Democrático, Honorable Héctor Ferrer Ríos.**

La parte peticionaria alega que el Artículo IV, Sección 5 de la Constitución de Puerto Rico, *supra,* **"...no establece la cantidad de votos necesarios para la confirmación de los**

de Gobierno constituirán colectivamente un consejo consultivo del Gobernador que se denominará Consejo de Secretarios.(Énfasis suplido).

**miembros del gabinete, por lo cual operan las normas generales de procedimiento parlamentario".** Sostiene que nuestra Constitución adoptó los principios generales del procedimiento parlamentario. Afirma que en Puerto Rico rige el principio de mayoría simple para el consentimiento por las Cámaras legislativas a la nominación del (la) Secretario(a) de Estado, toda vez que en aquellos casos en los cuales se estimó necesaria la mayoría absoluta de los miembros de los cuerpos legislativos así se hizo constar expresamente en el texto de la Constitución. Esgrime el argumento, que la Asamblea Constituyente incorporó expresa y textualmente en el magno documento el requisito de mayoría absoluta en ciertas instancias, y en aquellas otras donde no surge expresamente tal requisito, sostiene es porque no fue la intención del magno Cuerpo así exigirlo. Señala como ejemplos el Artículo III, sección 19 de la Constitución de Puerto Rico relativo a la aprobación de legislación[7]; y su Artículo III, sección 22, relativo al consentimiento a la

---

[7] **Const. E.L.A., Art. III, Sec. 19, 1 L.P.R.A.** En lo pertinente, dicha sección dispone lo siguiente:

> **Cualquier proyecto de ley que sea aprobado por una mayoría del número total de los miembros que componen cada cámara** se someterá al Gobernador y se convertirá en ley si éste lo firma o si no le devuelve con sus objeciones a la cámara de origen dentro de diez días (exceptuando los domingos) contados a partir de la fecha en que lo hubiese recibido.(Énfasis suplido).

nominación por el Gobernador de Puerto Rico del Contralor.[8] Aduce que el Reglamento de la Cámara de Representantes no exige como requisito mayoría absoluta para dar su consentimiento a la nominación del Secretario de Estado. Sostiene que ese Cuerpo tiene que guiarse por las normas procesales del Senado de Puerto Rico, cuyo reglamento, en su sección 47 dispone que los nombramientos serán aprobados por la mayoría de los miembros presentes en la sesión, siempre que al momento de la votación haya quórum.

La parte peticionaria afirma que la sección 45.5 del Reglamento de la Cámara de Representantes que dispone y reconoce la reconsideración del Cuerpo, debidamente solicitada, al consentimiento ya otorgado a una nominación del Gobernador, es contrario e inconsistente con ese magno documento. Sostiene que una vez concedido el consentimiento por el Cuerpo a la nominación de Secretaria de Estado **"procede como valor adquirido" y no puede reconsiderarlo y retirarlo.** Concluye que como no era procedente la votación en reconsideración, el Secretario del Cuerpo venía obligado a certificar al Gobernador de Puerto Rico el resultado de la primera votación.

Los peticionarios alegan que fue vulnerada por el Presidente de la Cámara de Representantes la intención de

---

[8] **Const. E.L.A., Art. III, Sec. 22, 1 L.P.R.A.** En lo aquí pertinente dicha sección preceptúa lo siguiente:

> **Habrá un Contralor que será nombrado por el Gobernador con el consejo y consentimiento de la mayoría del número total de los miembros que componen cada Cámara....**(Énfasis suplido).

dos (2) legisladores de mayoría de votarle a favor a la nominada, manipulando de esa forma la voluntad mayoritaria de los miembros presentes; subvirtiendo "**...el principio fundamental de derecho que establece que la intención del legislador es fundamental en la interpretación de los actos legislativos**". Arguye, que si el referido principio gobierna el método subjetivo de analizar la intención legislativa, "**...con mayor fuerza la voluntad legislativa verdadera debe ser el efecto consignado en una votación precisamente porque se trata de la fórmula más objetiva de medir su intención**".

La parte peticionaria arguye que la solicitud de una segunda votación, en reconsideración, en la Cámara de Representantes sólo sería posible si un legislador que votó a favor de la opción prevaleciente interesa cambiar su voto. Afirma que el Honorable Luis Pérez Ortiz no votó de forma distinta a como lo hizo en la primera votación porque no ejerció su voto en la segunda. Sostiene, que ello convierte su solicitud de reconsideración en una "**jurídicamente inválida**". Fundamenta su posición en que la esencia misma del mecanismo para solicitar una reconsideración a una votación, sobre un asunto como el presente, comprende la intención del legislador de cambiar su voto.

En conclusión, la parte peticionaria pretende que este Tribunal, mediante un recurso extraordinario de mandamus, determine lo siguiente: (1) la cantidad de votos necesarios para que la Cámara de Representantes de Puerto Rico otorgue su consentimiento a la nominación por el Gobernador(a) de

Puerto Rico del(la) Secretario(a) de Estado; (2) si procede que el consentimiento de ese Cuerpo a la referida nominación esté sujeto al trámite de reconsideración de sus decisiones; (3) si el Presidente de ese Cuerpo puede alegadamente ignorar la intención de dos (2) legisladores que efectivamente votaron, y fue contabilizado su criterio de una forma, que fue anunciado y registrado como el criterio mayoritario del cuerpo; (4) si es posible la solicitud de reconsideración por un legislador que votó a favor de la decisión mayoritaria, y en la segunda votación, en reconsideración, no ejerce su derecho a votar.

En su alegato presentado el 18 de mayo de 2005 la parte peticionaria se reiteró en sus planteamientos originales, ampliando sus fundamentos. Entiende como inaplicable la doctrina de cuestión política al caso ante nos.

La parte recurrida presentó su alegato el 18 de mayo de 2005; planteó que la intención de la Convención Constituyente fue de requerir, en el proceso de consejo y consentimiento de la Cámara de Representantes a la nominación del Secretario(a) de Estado, una mayoría absoluta. Sostiene que la nominada no obtuvo mayoría absoluta (26 votos) en la primera votación. Así lo entendieron la portavoz de la mayoría por el Partido Nuevo Progresista, de aquí en adelante P.N.P., y el de la minoría por el Partido Independentista Puertorriqueño, de ahora en adelante P.I.P. Aduce que, una vez solicitada la reconsideración de la votación original por uno de los

legisladores de mayoría, que votó a favor del consentimiento, y aprobada por la mayoría se procedió a la votación, y el portavoz, ni ninguno de los miembros de la minoría parlamentaria del Partido Popular Democrático, de ahora en adelante P.P.D., invocó o solicitó que se aplicaran las disposiciones que tenían disponibles en el Reglamento de la Cámara de Representantes para detener esa votación, a saber, las secciones 26.1 y 38.1.[9]

---

[9] La sección 26.1 de la Regla 26 del Reglamento de la Cámara de Representantes referente a la clasificación y preferencia de las mociones privilegiadas, dispone lo siguiente:

Cuando se esté discutiendo un asunto, el Presidente no podrá aceptar moción alguna que no sea una de las siguientes:

(a) para la levantar la Sesión;
(b) para decretar un receso;
(c) para que quede el asunto sobre la mesa;
(d) para proponer la cuestión previa;
(e) para proponer que se releve a una Comisión de la consideración de un asunto, cuando la Comisión a ser relevada no sea la única a la que se haya referido;
(f) para aplazar el asunto hasta una fecha dada;
(g) para posponer el asunto indefinidamente;
(h) para enmendar; o
(i) para proponer que el asunto pase a una Comisión.

Esas mociones tendrán preferencia de acuerdo al orden en que están enumeradas. Las primeras cinco se votarán sin debate.

Por su parte la sección 38.1 de la Regla 38 del referido reglamento, preceptúa lo siguiente:

Antes de comenzar una votación, el Presidente podrá pedir que se llame al Hemiciclo a los Representantes que se encuentren fuera del mismo, pero en el área del Capitolio.

(Continúa . . .)

Arguye la parte recurrida que, la votación, en reconsideración, se llevó a cabo por lista sin que ningún miembro de la Cámara de Representantes expresara reparo, duda o preocupación alguna sobre lo que estaba siendo objeto de esa nueva votación.  Sostiene que una vez concluido el proceso se anunció el resultado contabilizado de la votación final en torno al nombramiento de la Secretaria de Estado, que obtuvo veintidós (22) votos en contra de conceder el consentimiento y veinte (20) a favor. Afirma que ese mismo día, y con posterioridad a la determinación final del Cuerpo, dos (2) legisladores de mayoría solicitaron al Presidente autorización para realizar unas "expresiones no controversiales", según permite el Reglamento.  Expresaron que tenían el interés de votar a favor de conceder el consentimiento, por el Cuerpo, a la nominada.  Reconocieron haber emitido, por error, un voto distinto a su <u>intención</u>. Aceptaron su responsabilidad por el error cometido, y aclararon el récord legislativo.  No obstante, no solicitaron remedio alguno, mediante los mecanismos

_____

Asimismo, el Presidente podrá disponer que se suspenda la votación por un término no mayor de veinticuatro (24) horas y que se obligue a los miembros ausentes que se encuentren fuera del área del Capitolio, pero dentro de la Isla, a que asistan a la votación en el día y hora que se disponga a estos efectos.

El Sargento de Armas será responsable de poner en ejecución las disposiciones de este Reglamento a tales efectos.

parlamentarios disponibles, ante el Presidente y ante el Cuerpo.[10]

Subsiguientemente el portavoz de la minoría del P.P.D. solicitó una segunda reconsideración a la votación, descansando en las expresiones de los referidos dos (2) legisladores de mayoría. El Presidente del Cuerpo determinó lo siguiente:

> SR. PRESIDENTE: Compañero Ferrer Ríos, ese asunto de la reconsideración, establece el Artículo 40.1, la Sección 40.1, **"que en ningún caso podrá plantearse una segunda reconsideración"** **y ninguno de ellos, de hecho, ha solicitado la reconsideración.** La realidad compañero, y usted estuvo aquí el pasado cuatrienio, cuando en más de una ocasión, y si no recuerdo mal fueron dos ocasiones, donde compañeros, en una de ellas una compañera de la delegación del Partido Nuevo Progresista en aquel entonces, debatió un Proyecto en contra y luego cometió el error de votarle a favor tomándose su voto tal y como fue expresado, no como era la intención.

---

[10] A tenor con los principios básicos de procedimiento parlamentario que gobiernan la votación por lista, una vez celebrada la votación, **pero antes de que se contabilicen efectivamente los votos y el presidente del cuerpo deliberativo anuncie el resultado de la misma**, un miembro del Cuerpo podrá ponerse de pie, dirigirse al Presidente y, luego de ser reconocido por éste, proceder a solicitar el cambio de su voto. **Ahora bien, anunciado ya el resultado de la votación, resulta inoportuno, conforme a las normas parlamentarias, el que un legislador emita su voto o solicite cambiar el voto, tal como fue consignado y contabilizado originalmente.** Véase P. Mason, Mason´s Manual of Legislative Procedure, sec. 535, Minnesota, West Group, 2000, págs. 380-81. **Cabe reiterar que, del récord legislativo, no surge que los referidos legisladores de la mayoría del P.N.P. hubieran utilizado oportunamente el referido mecanismo para solicitarle al Presidente de la Cámara de Representantes cambiar sus respectivos votos.**

Resuelto el asunto, no ha lugar la Cuestión de Privilegio de Cuerpo. [11] (Énfasis suplido).

Sostiene la parte recurrida que una vez aclarados todos esos asuntos concluyeron los trabajos de la Cámara de Representantes de ese día. Esa misma noche y en cumplimiento con el requisito establecido en la Sección 45.5 del Reglamento[12], el Secretario procedió a emitir la notificación escrita al Gobernador sobre la determinación del Cuerpo.

Alega que el recurso de mandamus ante nos, es improcedente. Sostiene que la parte peticionaria no expone cuál es el ejercicio claro de un derecho a exigir la

---

[11] La sección 40.1 de la Regla 40 del Reglamento de la Cámara de Representantes de Puerto Rico, relativa a la reconsideración de asuntos, establece lo siguiente:

**A solicitud de cualquier Representante, la Cámara de Representantes podrá acordar la reconsideración de un asunto que haya sido resuelto, siempre que la solicitud se haga en la misma Sesión en que el asunto fue tratado o en el siguiente día de Sesión.** (Énfasis suplido).

**En ningún caso podrá plantearse la reconsideración de un asunto en dos (2) ocasiones o más y de conformidad con lo arriba expuesto.** (Énfasis suplido).

[12] La citada disposición reglamentaria preceptúa lo siguiente:

El Secretario de la Cámara de Representantes notificará al Gobernador de Puerto Rico las determinaciones de este Cuerpo Legislativo relacionadas con nombramientos, tan pronto éstas sean acordadas. No obstante, la notificación al Gobernador no se efectuará hasta tanto haya expirado el plazo en que puede solicitarse la reconsideración de un asunto, según se dispone en este Reglamento.

inmediata ejecución de un acto, que tiene que ser evidente e impuesto por ley o reglamento.

Arguye que no surge, de forma clara y patente de la petición, cuál es el deber ministerial del Secretario de la Cámara de Representantes impuesto por ley o reglamento. Afirma que la parte peticionaria no estableció en sus escritos que hubiera realizado un requerimiento previo a dicho funcionario para que éste realizara el acto cuyo cumplimiento solicita ante nos, a través del recurso extraordinario de mandamus.

Arguye la parte recurrida que el presente caso involucra procedimientos internos inherentes al Poder Legislativo, por lo que una intervención de este Tribunal laceraría el principio de separación de poderes. Entienden que los peticionarios presumen que pueden litigar ante este Tribunal aquellos asuntos políticos en los que no han podido prevalecer en el proceso parlamentario en la Cámara de Representantes. Sostiene que el recurso de mandamus presentado no contiene un "caso o controversia" justiciable. Sostiene que los peticionarios carecen de legitimación activa para incoar la acción presentada.

II

*MANDAMUS*

Concluimos que esta petición de mandamus no es procedente. El mandamus es un recurso extraordinario de equidad **"altamente privilegiado"**, que emite el Poder

Judicial para obligar a cualquier persona, corporación, junta o tribunal inferior a cumplir con un acto que la ley expresamente ordena como un deber resultante de un empleo, cargo o función pública.[13]

El requisito primordial del recurso de mandamus es que se trate de un deber ministerial impuesto por ley. La jurisprudencia ha establecido que la determinación de la procedencia del auto depende de si la actuación solicitada es un deber ministerial o si, por el contrario, involucra el ejercicio de discreción, en cuyo caso no puede expedirse.[14] El acto es ministerial cuando la ley prescribe y define el deber que tiene que ser cumplido con tal precisión y certeza que nada deja al ejercicio de la discreción o juicio. Cuando el acto que debe ser cumplido envuelve el ejercicio de discreción o juicio, no considerado ministerial, está fuera del ámbito del recurso de mandamus. La decisión de lo que es, o no, "un deber ministerial" no es algo que se pueda determinar mediante la aplicación de una fórmula inflexible.[15] Si el deber surge o no claramente de las disposiciones estatutarias aplicables es una cuestión sujeta a interpretación judicial no depende de un juicio *a priori,* fundado exclusivamente en la letra del estatuto. Tal

---

[13] Véase Arts. 649 y 650 del Código de Enjuiciamiento Civil de 1933, 32 L.P.R.A. secs. 3421 y 3422; Noriega Rodríguez v. Hernández Colón, 135 D.P.R. 406 (1994).

[14] Álvarez de Choudens v. Tribunal Superior, 103 D.P.R. 235 (1975).

[15] Partido Popular v. Junta de Elecciones, 62 D.P.R. 745, 749 (1944).

determinación ha de surgir del examen y análisis de todos los elementos útiles a la función interpretativa, del examen paciente y riguroso de la intención legislativa, de la evaluación de todos los elementos de juicio disponibles para auscultar el propósito y significado del estatuto en cuestión.[16]

Al considerar la solicitud de expedición de un auto de mandamus no es suficiente que el peticionario tenga un derecho claro a lo que solicita, y que el demandado tenga la obligación de permitir el ejercicio de ese derecho. Por tratarse de un auto **"altamente privilegiado"** los tribunales tienen necesariamente que medir la totalidad de las circunstancias presentes, tanto al determinar si debe o no expedirse el auto como también al fijar el contenido de su disposición, de haberlo expedido. El remedio se concede sólo cuando el tribunal está convencido de que con ello se cumplirán propósitos de utilidad social e individual. Es indispensable estimar los efectos que tendrá la intervención judicial en el adecuado cumplimiento de las responsabilidades del funcionario afectado. Resulta imperativo buscar el más fino **"balance y equilibrio"** entre los diversos intereses en conflicto.[17]

Este Tribunal tiene la obligación de tomar en cuenta, al momento de considerar un recurso como el presente, el velar

---

[16] Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 418 (1982).
[17] Dávila v. Superintendente General de Elecciones, 82 D.P.R. 264 (1960).

y proteger los intereses públicos que puedan ser perjudicados con la expedición del auto solicitado. Tiene el deber ineludible de proteger y garantizar nuestra forma republicana de gobierno, evitando una intromisión indebida de la Rama Judicial en los procedimientos del Poder Legislativo. El criterio que gobierna el asunto ante nos consiste en el impacto que la expedición del auto solicitado y nuestra intervención pudiera tener sobre el interés público inmanente del esquema democrático de la Constitución de Puerto Rico.

En nuestro sistema democrático de gobierno, fundado en la separación de poderes, resulta imprescindible el entendimiento de las funciones del parlamento. Entre las muchas funciones, que dentro de nuestro sistema democrático ejerce el parlamento, está la de fiscalizar al Poder Ejecutivo. Esto incluye su facultad de consejo y consentimiento a las nominaciones realizadas por el Gobernador(a) de Puerto Rico a distintas posiciones, incluyendo la del(la) Secretario(a) de Estado. Dicha prerrogativa legislativa proviene del concepto mismo de un gobierno dividido en tres poderes coordinados, separados, independientes, y de idéntico rango, que intervienen los unos con los otros mediante las medidas de **"balance y equilibrio"** establecidas en la Constitución de Puerto Rico. La función, como **"balance y equilibrio"**, del Poder Legislativo de **"consejo y consentimiento"** contiene en si misma su propia justificación, en cuanto contribuye al

desempeño de una Asamblea Legislativa representativa de su rol constitucional. El despojo o la limitación al Poder Legislativo de esa función básica en un sistema como el vigente en Puerto Rico socavaría la base misma de nuestra democracia.[18]

Los cuerpos legislativos pueden adoptar reglas de gobierno interno como corolario del poder inherente de controlar sus procedimientos. Las cámaras legislativas tienen poder expreso, a tenor con el Artículo III, sección 9 de la Constitución de Puerto Rico[19], para adoptar reglas para sus procedimientos y gobierno interno. Al ejercer la función de reglamentar, la Asamblea Legislativa no puede obviar e ignorar sus limitaciones constitucionales. Cuando haya conflicto sobre el alcance de los poderes constitucionales de una rama de gobierno los tribunales deben intervenir, con prudencia y deferencia, para aclarar los contornos de la Constitución de Puerto Rico. La

---

[18] _Romero Barceló v. Hernández Agosto_, 115 D.P.R. 368 (1984).

[19] **Const. E.L.A., Art. III, Sec. 9, 1 L.P.R.A.** La referida disposición constitucional lee de la forma siguiente:
>Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección; elegirá sus funcionarios, **adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno**; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencias en la Sección 21 de este Artículo. Cada cámara elegirá un presidente de entre sus miembros respectivos. (Énfasis suplido).

determinación sobre la validez constitucional de una norma contenida en el Reglamento de la Cámara de Representantes corresponde a los tribunales. Para determinar si una actuación de la Cámara de Representantes está cobijada o no bajo la protección de inmunidad parlamentaria hay que examinar no sólo si la misma es parte integrante de actividades legislativas legítimas sino también si cumple con los parámetros constitucionales[20].

El mandamus es un recurso extraordinario que sólo debe expedirse cuando el peticionario carece de otro recurso adecuado y eficaz en el curso ordinario de los procedimientos dispuestos por ley, y su derecho es claro.[21] Es improcedente el vehículo procesal de mandamus, cuando existe otro mecanismo procesal de la naturaleza mencionada, para atender el remedio solicitado. Es improcedente el recurso de mandamus cuando pretende la atención y consideración por este Tribunal de un planteamiento sobre la inconstitucionalidad de alguna disposición del Reglamento de la Cámara de Representantes de Puerto Rico, o de alguna de sus actuaciones, por tener disponible el mecanismo de la sentencia declaratoria ante el Tribunal de Primera Instancia[22]. Es improcedente un reclamo como el

---

[20] Silva v. Hernández Agosto, 118 D.P.R. 45 (1986).

[21] Espina v. Calderón, 75 D.P.R. 76 (1953); Santiago Lavandero v. Tilén, 71 D.P.R. 754 (1950).

[22] Regla 59 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 59; El Vocero v. C.E.E., 130 D.P.R. 525 (1992); Gierbolini Rodríguez v. Hernández Colón, 129 D.P.R. 402 (1991); Márquez v. Gierbolini, 100 D.P.R. 839 (1972).

presente, cuando el alegado derecho de la parte peticionaria, y su razón de pedir, no es claro. Esa es la situación del caso ante nos. En este caso la petición no se sostiene sobre el reclamo de unos derechos que sean exigibles, como cuestión de derecho. Veamos.

El Gobernador de Puerto Rico no ha establecido, como peticionario, en que forma se ha vulnerado el **"balance y equilibrio"** que debe existir entre la Rama Ejecutiva y la Legislativa durante el referido proceso legislativo, celebrado ante la Cámara de Representantes. No ha establecido, además, como lo actuado en la Cámara de Representantes violó el principio constitucional de la separación de poderes. No ha demostrado como el proceso de votación original y posteriormente de votación, en reconsideración, ha intervenido con su prerrogativa y rol constitucional de nominación al(la) Secretario(a) de Estado. No ha ilustrado a este Tribunal sobre la violación de sus prerrogativas. Lo actuado por el referido Cuerpo legislativo no limitó su facultad de nominación del(la) Secretario(a) de Estado. Tampoco concentró el **"poder de nombramiento con el consejo y consentimiento"** en la Rama Legislativa. Tal actuación no disminuyó su independencia, como Poder Ejecutivo, para realizar tal nominación. El Primer Ejecutivo pretende, como litigante, reclamar la violación de las prerrogativas de dos (2) legisladores de mayoría que expresaron que efectivamente votaron, y así fue contabilizado y anunciado, de una forma distinta a su

intención, cuando esos dos legisladores no utilizaron oportunamente los mecanismos parlamentarios que tenían disponibles para pedir un remedio al Presidente o al Cuerpo mismo. Pretende el Primer Ejecutivo, mediante un recurso extraordinario de mandamus, pedir un remedio a este Tribunal, apoyándose en una alegada vindicación de esas prerrogativas legislativas, de esos (2) legisladores de mayoría que no figuran como partes peticionarias ante este Tribunal. No existe ningún deber ministerial que pueda reclamar el Gobernador de Puerto Rico al Secretario de la Cámara de Representantes, dentro del marco de las circunstancias de este caso y lo alegado por la parte peticionaria ante nos.

La señora Marisara Pont Marchese, nominada por el Gobernador de Puerto Rico como Secretaria de Estado, pretende que este Tribunal determine que por medio de la votación original que produjo un resultado mayoritario a favor del consentimiento a su nominación ella adquirió un interés o derecho propietario en dicho cargo. Sostiene que era improcedente una segunda votación, en reconsideración, por el Cuerpo por tal motivo, por lo que el resultado de la misma, de no conceder el consentimiento a su nominación, es inválido. Por ser incorrecta, como cuestión de derecho, tal contención no justifica reclamo alguno que le permita sostener el tener y disfrutar de algún derecho frente al

Secretario de la Cámara de Representantes[23]. No expuso una reclamación que, por su razón de pedir, la hiciera acreedora a la concesión de un remedio. Tampoco puede, como litigante reclamar las prerrogativas legislativas de los referidos dos (2) legisladores. Es improcedente el remedio solicitado por la señora Pont Marchese a los efectos que este Tribunal le ordene al Secretario de la Cámara de Representantes, como un deber ministerial impuesto por ley, que certifique que dicho Cuerpo ha consentido a su nominación como Secretaria de Estado porque ella adquirió un interés o derecho propietario en dicho cargo como resultado de la votación original, o porque, en representación de los referidos dos (2) legisladores de mayoría, ella pueda reclamar sus derechos y prerrogativas, y alegadamente vindicar la voluntad mayoritaria de la Cámara de Representantes.

El Honorable Héctor Ferrer Ríos, portavoz de la minoría del Partido Popular Democrático en la Cámara de Representantes, pretende ante este Tribunal reclamar las prerrogativas de dos (2) legisladores de la mayoría del Partido Nuevo Progresista, cuando estos no reclamaron oportunamente remedio alguno al Presidente y al Cuerpo, mediante los mecanismos del procedimiento parlamentario, ni tampoco ante este Tribunal. Pretende, además, que este Tribunal revise la interpretación que el Presidente le

---

[23] La improcedencia de la pretensión de la señora Pont Marchese es discutida ampliamente más adelante, en el análisis de la existencia o no de legitimación para ser actora y promovente del recurso de mandamus.

brindó al Reglamento de la Cámara de Representantes, al atender su planteamiento, y que él no apeló ante ese Cuerpo.

La expedición del auto de mandamus sólo procede cuando **"el derecho a exigir la inmediata ejecución de un acto sea evidente y aparezca que no podrá dar ninguna excusa para no ejecutarlo"**. El Tribunal podrá ordenar perentoriamente la concesión del remedio. La petición deber ser juramentada[24]. No surge de los alegatos de la parte peticionaria cual es su derecho para exigir la inmediata ejecución del acto pretendido, consistente en que el Secretario de la Cámara de Representantes certifique el consentimiento del Cuerpo a la nominación por el Gobernador de Puerto Rico a la señora Marisara Pont Marchese como Secretaria de Estado. Tampoco surge que los aquí peticionarios le hubieren exigido el cumplimiento de tal acto a ese funcionario, antes de recurrir ante este Tribunal, y cual fue la respuesta del mismo para entonces ilustrar al Tribunal sobre la injustificación del motivo para denegar su solicitud.

No debemos nunca considerar la expedición del auto de mandamus cuando al así hacerlo se produzca, como resultado neto, una intromisión de la Rama Judicial en los procedimientos de otra rama de gobierno. El presente caso es uno claro que involucra procedimientos internos inherentes al ejercicio de las prerrogativas constitucionales de la Rama Legislativa, por lo que una

---

[24] Regla 55 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 55.

intervención de este Tribunal, laceraría la forma republicana de nuestro gobierno. De intervenir este Tribunal en este asunto afectaría los derechos constitucionales de los Representantes a la Cámara; entre otros, la forma como ejercen su derecho al voto.

La alegación de la parte peticionaria a los efectos que prevalece el principio de mayoría simple sobre el de mayoría absoluta en la consideración por la Cámara de Representantes de la nominación al cargo de Secretario(a) de Estado resulta inmeritoria ante el hecho que ese Cuerpo negó, en forma válida, su consentimiento a tal nominación, en reconsideración. Discrepamos muy respetuosamente de la posición del Juez Asociado señor Fuster Berlingeri sobre este asunto. Los legisladores de mayoría que expresaron que no fue su intención votar, en reconsideración, en contra del consentimiento a la nominación no utilizaron los mecanismos que tenían disponibles en el Reglamento de la Cámara de Representantes y en el Manual de Procedimiento Parlamentario para requerir oportunamente un cambio de su voto, antes que fuera contabilizado y anunciado. El planteamiento hecho por el portavoz de la minoría del P.P.D. sobre tal asunto, y resuelto por el Presidente no fue apelado por éste al Cuerpo. No fueron afectados en forma alguna las prerrogativas de esos legisladores, constitucionalmente protegidas. Tampoco fue afectada prerrogativa alguna del Gobernador de Puerto Rico protegida por la Constitución de Puerto Rico. No presenta para nosotros duda alguna que este

caso involucra procedimientos internos inherentes al ejercicio de las prerrogativas constitucionales de la Cámara de Representantes. La intervención de este Tribunal en este asunto equivaldría a una supervisión sobre la forma como los legisladores ejercen su derecho al voto.

## III

## CUESTION POLÍTICA
## NO JUSTICIABILIDAD DE LAS CAUSAS

**Consideramos que el asunto que plantea este caso, es uno que no debe ser objeto de determinación judicial, por ser una cuestión política. La autoridad para analizar los aspectos relacionados a la justiciabilidad de las causas, nace del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas, que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas.[25] Los tribunales nos imponemos las limitaciones que emanan de esa doctrina para, entre otras cosas, observar y garantizar el justo balance que se requiere de las distintas ramas de gobierno en la administración de la cosa pública. El análisis de este principio es, por lo tanto, imperativo y necesario dentro de nuestro sistema de separación de poderes. Las limitaciones que surgen de éste imponen un**

---

[25] E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958).

**mínimo de condiciones para el ejercicio discreto y tolerable de un poder que, de otro modo, constituiría una clara amenaza para la calidad democrática de nuestro sistema.[26]**

La aplicación de las diversas doctrinas que dan vida al principio de justiciabilidad determinan la jurisdicción de los tribunales, particularmente con relación a las controversias que se le presentan, al amparo de los derechos que garantiza nuestra Constitución y la democracia que instrumenta. Se trata, pues, de una cuestión de umbral que debemos analizar ante las controversias que nos ocupan.[27]

La doctrina de cuestión política, según desarrollada en la jurisdicción federal, surge de consideraciones sobre el principio constitucional de separación de poderes.[28] Si en un caso hay presente una cuestión política, el caso no será justiciable, y el tribunal debe abstenerse de adjudicarlo. La doctrina de cuestión política plantea, en esencia, que hay asuntos que no son susceptibles de determinación judicial, porque su resolución corresponde a las otras ramas del Gobierno, la Legislativa o Ejecutiva, o en última instancia al electorado.[29]

Una cuestión política no es susceptible de determinación judicial, porque su resolución corresponde propiamente al

---

[26] Íd., pág. 597.

[27] P.P.D. v. Peña Clos I, 140 D.P.R.779 (1996).

[28] Baker v. Carr, 369 U.S. 186, 210 (1962).

[29] Noriega Rodríguez v. Hernández Colón, *supra*, pág. 422.

proceso político de gobierno, que se produce en las otras dos (2) ramas, y no al Poder Judicial.[30]

Los criterios judiciales para determinar qué constituye una cuestión política son:

**(A) La Constitución delega expresamente el asunto en controversia a otra rama del Gobierno.**

**(B) No existen criterios o normas judiciales apropiadas para resolver la controversia.**

(C) Resulta imposible decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales.

**(D) Resulta imposible tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno.**

(E) Hay una necesidad poco usual de adherirse sin cuestionar a una decisión política tomada previamente.

(F) Hay el potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto.[31]

Sobre este tema expresan Rotunda y Nowak lo siguiente:

> *The political question doctrine—which holds that certain matters are really political in nature and best resolved by the body politic rather than by courts exercising judicial reviewis [sic] a misnomer. It should more properly be called the doctrine of nonjusticiability,*

---

[30] Silva v. Hernández Agosto, *supra*; Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977); Powell v. McCormack, 395 U.S. 486 (1969).

[31] Baker v. Carr, *supra*; reafirmado en nuestra jurisdicción en Silva v. Hernández Agosto, *supra*.

> *that is, a holding that the subject matter is inappropriate for judicial consideration. An important consequence of the political question doctrine is that a holding of its applicability to a theory of a cause of action renders the government conduct immune from judicial review.* Unlike other restrictions on judicial review-doctrines such as case or controversy requirements, **standing**, ripeness and prematurely, **abstractness**, mootness, and **abstention**-- all of which may be cured by different factual circumstances, **a holding of nonjusticiability is absolute in its foreclosure of judicial scrutiny.** [32] (Énfasis suplido).

Hemos expresado, aludiendo al profesor Raúl Serrano Geyls, que existen tres (3) vertientes de la doctrina de cuestión política, a saber: **(1) la que requiere que los tribunales no asuman jurisdicción sobre un asunto, porque éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno;** (2**) aquella según la cual los tribunales deben abstenerse de intervenir, bien porque no existen criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, o bien por la presencia de otros factores análogos,** y **(3) la que aconseja la abstención judicial por consideraciones derivadas de la prudencia.** [33]

**Si la Constitución confiere una facultad expresa a una rama de gobierno y ésta es de naturaleza política, no estará sujeta a revisión judicial, salvo que se ejecute**

---

[32] 1 Rotunda y Nowak, <u>Treatise on Constitutional Law: Substance and Procedure 3er ed.</u>, Sec. 2.16(a), págs. 311-312 (1999).

[33] <u>C.E.S. v. Gobernador</u>, 137 D.P.R. 83, 102 (1994); <u>Noriega Rodríguez v. Hernández Colón</u>, *supra*.

**incorrectamente afectando derechos constitucionales de igual jerarquía.**[34]

Lo realmente importante en los casos que encierran la doctrina de cuestión política, es el análisis sobre si una cláusula constitucional provee derechos que puedan ser compelidos mediante una acción judicial.[35]

La doctrina de cuestión política debe ser aplicada en términos funcionales, a tenor con los hechos específicos de cada caso en particular. La doctrina no es aplicable cuando existen derechos constitucionales individuales importantes que serían afectados si el Poder Judicial no actúa.[36]

**Como regla general, la doctrina de cuestión política impide la revisión judicial de asuntos cuya resolución corresponde a las otras ramas políticas del Gobierno o al electorado.**[37] **En Silva v. Hernández Agosto**, *supra*, **reiteramos nuestros pronunciamientos anteriores y expresamos que "ante reclamos de cuestión política hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución, y para determinar si los actos**

---

[34] Silva v. Hernández Agosto, *supra*; United States v. Nixon, 418 U.S. 683 (1974); Powell v. McCormack, *supra*; R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Colegio de Abogados de Puerto Rico, 1986, Vol. I, págs. 697-698.

[35] L.H. Tribe, American Constitutional Law, 2da. Ed., Nueva York, Ed. Foundation Press, 1988, págs. 98 y 106.

[36] Véase F.W. Scharpf, Judicial Review and The Political Question: A Functional Analysis, 75 Yale L.J. 566-597 (1966); Noriega Rodríguez v. Jarabo, 136 D.P.R. 497 (1994).

[37] Noriega Rodríguez v. Jarabo, *supra*.

**de una rama de gobierno exceden su autoridad constitucional."**[38]

La controversia ante nos presenta una cuestión política, que no es justiciable. La actuación de la Cámara de Representantes de Puerto Rico está dentro de los poderes delegados por la Asamblea Constituyente a esa rama de gobierno. No encontramos en tal actuación un ejercicio incorrecto de su autoridad constitucional. Dicho Cuerpo legislativo se limitó a ejercer su facultad de considerar la nominación al cargo de Secretario(a) de Estado, por el Gobernador de Puerto Rico. En una primera votación prevaleció el criterio mayoritario de conceder el consentimiento a la referida nominación. En la segunda votación, en reconsideración, prevaleció el criterio mayoritario contrario, de no conceder el consentimiento a la misma. Este último fue certificado por el Secretario del Cuerpo al Gobernador de Puerto Rico, como deber ministerial impuesto por el Reglamento de la Cámara de Representantes de Puerto Rico.

## IV

## LEGITIMACIÓN ACTIVA

Tenemos la obligación ineludible de cerciorarnos de que las partes que promueven la controversia ante nos están particular e individualmente capacitados para así hacerlo, y de que su interés es uno de tal naturaleza que, con toda probabilidad,

---

[38] United States v. Nixon, *supra*.

habrá de proseguir su causa de acción vigorosamente, y habrá de traer a la atención del tribunal las cuestiones en controversia.[39]

La doctrina de legitimación activa exige que el promovente de la acción demuestre que cumple con determinados requisitos indispensables, a saber: **(1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso y no uno abstracto e hipotético; (3) que la causa de acción debe surgir bajo el palio de la Constitución o de una ley; y (4) que exista una conexión entre el daño sufrido y la causa de acción ejercitada.**[40]

¿Tiene el Honorable Aníbal Acevedo Vilá, Gobernador de Puerto Rico legitimación activa para presentar el recurso de mandamus ante nos?  Contestamos dicha interrogativa en la negativa.  El Gobernador no ha establecido y demostrado los requisitos indispensables, que establecen la doctrina, para acreditar su legitimidad  como actor promovente del recurso de mandamus presentado.  No ha ilustrado a este Tribunal cual de sus prerrogativas constitucionales como Primer Ejecutivo a sido violentada por la actuación de la Cámara de Representantes.  No ha demostrado cual es el **"daño claro y palpable"** a cualquiera de esas prerrogativas, que sea **"real, inmediato y preciso"**.

---

[39] <u>Noriega Rodríguez v. Hernández Colón</u>, *supra*; <u>Hernández Agosto v. Romero Barceló</u>, *supra*.

[40] <u>Noriega Rodríguez v. Hernández Colón</u>, *supra*; <u>Hernández Torres v. Hernández Colón</u>, 131 D.P.R. 593 (1992); <u>Hernández Torres v. Gobernador</u>, 129 D.P.R. 824 (1992).

¿Tiene la señora Marisara Pont Marchese legitimación activa para presentar el recurso de mandamus ante nos? Contestamos dicha interrogante en la negativa. La señora Pont Marchese no adquirió un valor, interés o derecho propietario, constitucionalmente protegido, a través del proceso de su nominación, por el Gobernador de Puerto Rico, y el de consejo y consentimiento en el Senado y la Cámara de Representantes. Por lo que no ha sufrido un **"daño claro y palpable que sea real, inmediato y preciso"**. Veamos.

Apoyándose en lo resuelto por el Tribunal Supremo de Estados Unidos en U.S. v. Smith [41], y en una alegada similitud fáctica entre dicho caso y el que nos ocupa, la señora Marisara Pont Marchese arguye, que una vez la Cámara de Representantes prestó su consentimiento, en votación original, a su nominación como Secretaria de Estado, ésta adquirió un interés o derecho propietario en el cargo al que fue nominada. Alega que la segunda votación del Cuerpo, en reconsideración, resultó improcedente y carente de validez jurídica. Sostiene que, en su lugar, procedía que el recurrido, Secretario de la Cámara de Representantes, certificara inmediatamente al Gobernador de Puerto Rico el resultado de la votación original emitida por el Cuerpo de 24-16, a favor del consentimiento a la nominación.

Contrario a lo aducido como precedente por la parte peticionaria, el cuadro fáctico de U.S. v. Smith, *supra*,

---

[41] 286 U.S. 6, 52 S.Ct. 475 (1932).

resulta, en varios extremos medulares, **<u>disímil</u>** a los hechos ante nos. Veamos.

En <u>U.S. v. Smith</u>, *supra*, el Tribunal Supremo de Estados Unidos acogió un auto de certificación procedente de la Corte de Apelaciones del Distrito de Columbia, concerniente a un recurso de *quo warranto* interpuesto por el Senado federal cuestionando si el señor George Otis Smith ocupaba legalmente la posición de miembro y presidente de la "Federal Power Commission". En primera instancia, la Corte Suprema del Distrito de Columbia emitió una sentencia denegando el referido recurso de *quo warranto*; subsiguientemente, el Senado apeló a la Corte de Apelaciones del Distrito de Columbia, la cual certificó el asunto ante el Tribunal Supremo de Estados Unidos. Los hechos que dieron margen al citado caso son los siguientes:

El 3 de diciembre de 1930, el Presidente de Estados Unidos, Herbert Hoover, envió al Senado, para su consejo y consentimiento, la nominación del señor George Otis Smith como miembro de la "Federal Power Commission". El 20 de diciembre de ese año, en sesión ejecutiva, el Senado concedió el consentimiento a tal nominación mediante votación mayoritaria de 38 a 22. Ese mismo día el Senado ordenó que la Resolución emitida sobre esos extremos fuera notificada al Presidente. La Resolución fue emitida tarde en la noche del mismo día y, a renglón seguido, el Senado levantó la sesión.

El 22 de diciembre de 1930, el Secretario del Senado notificó al Presidente de Estados Unidos la referida Resolución concediendo el consentimiento del Cuerpo a la nominación. Con idéntica fecha, el Presidente emitió el nombramiento; suscribió, y por conducto del Departamento de Estado, entregó al señor Smith una comisión nombrándole como miembro de la "Federal Power Commission", designándole presidente de la misma. Ese mismo día, el señor Smith juró al cargo y comenzó a descargar sus deberes como comisionado.

El 5 de enero de 1931, día en que continuó la celebración de la sesión ejecutiva del Cuerpo, un senador que había votado inicialmente a favor de la nominación del señor Smith presentó una moción para reconsiderar la votación original. También, se presentó otra moción para que el Presidente de Estados Unidos devolviera al Secretario del Cuerpo la Resolución que le había sido notificada sobre el consentimiento concedido a la nominación del señor Smith. Ambas mociones fueron acogidas por el Cuerpo y el Presidente de Estados Unidos fue notificado de ello debidamente. El 10 de enero de ese mismo año, mediante comunicación escrita, el Presidente informó al Senado que rehusaba acceder a lo pretendido toda vez que, tras recibir notificación formal del consentimiento del Cuerpo a la nominación, ya había extendido el nombramiento al señor Smith y le había asignado sus funciones.

El 4 de febrero de 1931, la nominación del señor Smith fue traída nuevamente ante la consideración del Senado, en reconsideración. En esta ocasión, una mayoría de los senadores votó en contra de conceder el consentimiento. El Presidente de Estados Unidos fue notificado de la acción tomada por el Senado y, posteriormente, el referido Cuerpo presentó el recurso de *quo warranto* para cuestionar el derecho del señor Smith a permanecer en el cargo.

El Tribunal Supremo de Estados Unidos se enfrentó a la interrogante de si el Senado federal, a tenor con sus propias reglas, ostentaba el poder para reconsiderar su voto original de consentir a la nominación del señor Smith, aún cuando la Resolución otorgando el consentimiento ya había sido notificada al Presidente y éste, actuando sobre ésta, había extendido el nombramiento y el señor Smith había prestado juramento al cargo y comenzado a ejercer las funciones del mismo.

El Tribunal Supremo de Estados Unidos confirmó la Sentencia de la Corte Suprema del Distrito de Columbia, denegando el auto de *quo warranto*. Al así resolver, determinó que el Senado había violado su propio reglamento, por lo que estaba impedido de retirar en reconsideración, el consentimiento otorgado a la nominación del señor Smith. La disposición reglamentaria allí en controversia era la Regla XXXVIII, la cual disponía, en su tercer y cuarto acápite, lo siguiente:

> **3. When a nomination is confirmed or rejected, any Senator voting in the**

*majority may move for a reconsideration on the same day on which the vote was taken, or on either of the next two days of actual executive session of the Senate; but if a notification of the confirmation or rejection of a nomination shall have been sent to the President before the expiration of the time within which a motion to reconsider may be made, the motion to reconsider shall be accompanied by a motion to request the President to return such notification to the Senate.* Any motion to reconsider the vote on a nomination may be laid on the table without prejudice to the nomination, and shall be a final disposition of such motion.

*4. Nomination confirmed or rejected by the Senate shall not be returned by the Secretary to the President until the expiration of the time limited for making a motion to reconsider the same, or while a motion to reconsider is pending unless otherwise ordered by the Senate.* (Énfasis suplido)

Examinada la disposición reglamentaria antes citada, el Tribunal Supremo de Estados Unidos expresó que la cuestión primordial a resolver no residía en la constitucionalidad de la referida disposición en sí, sino en la interpretación que a ella le había dado el Senado de Estados Unidos, en aquella situación particular. A pesar de que el Tribunal Supremo de Estados Unidos reconoció que al ejercer su poder de revisión judicial debía otorgarle gran peso y deferencia a las interpretaciones que el referido cuerpo legislativo realizara de sus propias reglas, siempre y cuando las aplicara dentro de los parámetros constitucionales, sostuvo que el historial y los precedentes del Cuerpo **no demostraban que el Senado tuviera la facultad constitucional para reconsiderar un voto de consentimiento**

**a una nominación <u>después de que el nominado hubiera tomado posesión de su cargo y comenzado a ejercer sus deberes</u>**.[42]

De lo antes expuesto, se desprende, con meridiana claridad, que el Tribunal Supremo de Estados Unidos invalidó la acción del Senado de no conceder su consentimiento, en reconsideración, a una nominación previamente aprobada[43]. Sostuvo su decisión en que el Senado no podía reconsiderar el voto concediendo el consentimiento al señor Smith y rechazarlo, en reconsideración, **<u>luego que una notificación formal del Cuerpo concediendo el consentimiento había sido remitida al Presidente y éste había procedido a extender el nombramiento, a tenor con ella. Como cuestión de hecho, al momento de la reconsideración, el Presidente ya había extendido el nombramiento, suscrito la comisión designando al señor Smith y éste último había prestado juramento al cargo y</u>**

---

[42] Con respecto a este particular, el máximo Foro judicial federal manifestó en <u>U.S. v. Smith</u>, *supra*, pág. 48, lo siguiente:

> **Even in the view most favorable to the Senate's contention they fall far short of clear recognition of the power, never heretofore asserted by the Senate itself, to reconsider a vote of confirmation, <u>after an appointee has actually assumed office and entered upon the discharge of his duties</u>**. (Énfasis suplido)

[43] La antigua Regla XXXVIII del Senado federal, *supra*, autorizaba al referido Cuerpo a reconsiderar un voto confirmando o rechazando una nominación, **<u>incluso</u>** cuando una notificación de confirmación o rechazo hubiera sido enviada al Presidente antes de que expirara el término reglamentario dispuesto para presentar una moción de reconsideración.

**comenzado a ejercer sus prerrogativas como comisionado.** Evidentemente, éstas no son las circunstancias del caso ante nuestra consideración.

Por último, es de rigor puntualizar que el Tribunal Supremo de Estados Unidos fundamentó su decisión, entre otras cosas, en la interpretación inconsistente que el Senado le impartió a sus propias reglas y en la formalidad que debe observarse en las relaciones entre las diferentes ramas del gobierno, que tienen deberes concurrentes, de manera que cada rama pueda descansar en la notificación formal y definitiva que reciba de una acción tomada por otra rama. **En ningún momento el máximo Foro judicial federal hizo expresión alguna en su decisión, a los efectos de que el Senado estuviera impedido de reconsiderar el consentimiento otorgado a la nominación del señor Smith, dentro del término establecido por el Reglamento del Cuerpo, porque éste hubiera adquirido un valor propietario en el cargo para el que fue nominado, después de celebrada la primera votación y antes de vencer el referido término reglamentario para así hacerlo. No obstante, el Tribunal Supremo de Estados Unidos partió de la premisa inarticulada que cuando se dan las circunstancias específicas acaecidas en el caso del señor Smith, el funcionario adquiere un interés o derecho propietario en el cargo.**

## LEGITIMACIÓN ACTIVA DE LEGISLADORES

Sobre el tema de la legitimación activa de legisladores expresamos en <u>Noriega Rodríguez v. Hernández Colón</u>[44], en el 1994, lo siguiente:

> [C]on respecto al caso particular de los legisladores, existen diversas instancias bajo las cuales este Tribunal, en el pasado, le ha reconocido legitimación activa a un legislador para incoar su acción. Se observa que le hemos permitido defender un interés individual tradicional vinculado con el proceso legislativo e invocado frente a funcionarios de dicho Cuerpo tanto en su calidad individual de legislador como en representación de un grupo de dicho Cuerpo. **A modo de ejemplo, en *Santa Aponte v. Srio. del Senado*, ante, este Foro le confirió legitimación activa a un Senador de Distrito para impugnar el intento de dicho cuerpo de excluirle de su escaño mientras se determinaba si éste había sido electo válidamente. En *Silva v. Hernández Agosto*, ante, también se permitió que unos Senadores, en representación de una minoría política de dicho cuerpo, cuestionaran una regla senatorial que alegadamente coartaba sus derechos constitucionales a participar en las etapas esenciales y significativas de los procesos investigativos o deliberativos en las comisiones de ese cuerpo.** (Énfasis suplido).
>
> **De igual manera, tradicionalmente se ha reconocido que un legislador tiene legitimación activa, como representante oficialmente autorizado por dicho cuerpo, para impugnar una actuación ilegal del ejecutivo. En este contexto, también hemos reconocido que un legislador tiene legitimación activa para vindicar un interés personal en el ejercicio pleno de sus funciones legislativas afectadas por actuaciones u omisiones del poder ejecutivo.** Tribe, op. cit., pág. 150. Ejemplo de lo antes expuesto lo es el caso **de *Hernández Agosto v. Romero Barceló*, ante. Allí el Presidente del Senado, autorizado por una**

---

[44] 135 D.P.R. 406, 427-431 (1994).

**resolución de dicho Cuerpo, radicó un mandamus para ordenar al Gobernador a enviar al Senado, para su consejo y consentimiento, las nominaciones de aquellos funcionarios del Gabinete gubernamental que éste había decidido retener para su segundo término en la Gobernación.** Este Tribunal le reconoció legitimación activa, tanto en su capacidad de Presidente del Senado para comparecer a nombre del Cuerpo, así como en su carácter individual de legislador, por entender que como miembro del Senado, tenía "un legítimo interés en participar en el ejercicio de la función constitucional de ese cuerpo de consejo y consentimiento. La omisión del alegado deber del Gobernador de enviar la nominación al Senado ciertamente le impediría intervenir en el proceso de confirmación y menoscabaría sus funciones constitucionales como senador". Íd., pág. 415. Conforme a ello, se concluyó que **"los legisladores en su condición de miembros de la Asamblea Legislativa tienen capacidad jurídica para vindicar sus prerrogativas y funciones constitucionales tales como, en este caso, la participación de los miembros del Senado en el proceso de confirmación alegadamente menoscabada por el Gobernador".** Íd., pág. 416.[45] (Énfasis suplido).

Los requisitos exigidos a un legislador, conforme a la doctrina de legitimación activa, fueron recientemente avalados por este Tribunal en dos casos. En el primero de éstos, *Hernández Torres v. Gobernador*, ante, dos Representantes de la Cámara, por sí y en representación de la entonces minoría del Partido Nuevo Progresista (en adelante P.N.P.) de dicho cuerpo legislativo, impugnaron la constitucionalidad de la Resolución Conjunta de Presupuesto de Mejoras Capitales y Gastos de Funcionamiento del Estado Libre Asociado (en adelante E.L.A.) *en*

---

[45] Véanse, además: *Nogueras Cartagena v. Hernández Colón*, 127 D.P.R. 638 (1991); *Nogueras Cartagena v. Hernández Colón*, [127 D.P.R. 405 (1990)]; *Peña Clos v. Cartagena Ortiz*, [114 D.P.R. 576 (1983)]; Nota, *Congressional Access to the Federal Courts*, [90 (Núm. 8) Harv. L. Rev. 1632, 1641-1642 (1977)].

*defensa del interés público*. **Una mayoría de este Tribunal determinó que los legisladores promoventes no tenían legitimación activa para impugnar una ley en representación de sus votantes o del interés público *en vista de que el agravio alegado era uno de índole general y no uno para vindicar un interés personal vinculado con el ejercicio de sus prerrogativas y funciones legislativas*. Se indicó que los legisladores, a base de un perjuicio general, pretendían que los tribunales revocaran una decisión aprobada por mayoría en un proceso democrático en el que no hubo menoscabo alguno de sus prerrogativas legislativas, por lo que éstos no podían trasladar al foro judicial el debate legislativo en el que no pudieron persuadir a sus colegas de los méritos de su postura. Íd., págs. 841-842.** (Énfasis suplido).

En dicho caso, **los demandantes alegaron, como parte de sus prerrogativas legislativas afectadas por la ley impugnada, "el derecho y el deber de fiscalizar la obra pública y el funcionamiento del Gobierno ...".** *Hernández Torres v. Gobernador*, ante, pág. 843. **La Opinión mayoritaria de este Tribunal rechazó tal contención. A esos efectos, se concluyó que tales prerrogativas no fueron lesionadas dado que los demandantes ejercieron su función fiscalizadora a cabalidad en dicho cuerpo; éstos tuvieron los instrumentos necesarios e igualdad de oportunidades en todas las etapas significativas del proceso legislativo, defendieron sus posturas y participaron a plenitud en el mismo. Íd., pág. 846.**(Énfasis suplido).

En el subsiguiente caso de *Hernández Torres v. Hernández Colón et al.*, ante, la demandante Hernández Torres, en su condición de Representante a la Cámara, impugnó la constitucionalidad de la Ley del Departamento de Asuntos de la Comunidad Puertorriqueña (en adelante D.A.C.P.). Alegó que la asignación de fondos al D.A.C.P., por estar sito fuera de los límites territoriales de la isla, "'le est[aba] causando un daño inmediato e irreparable al pueblo de Puerto Rico'" y que sus prerrogativas legislativas se estaban viendo afectadas por tener que "'legislar para la consideración y asignación de recursos a un departamento gubernamental

creado mediante la aprobación de una ley inconstitucional'". Íd., pág. 597.

**Nuevamente, una mayoría de este Tribunal le denegó legitimación activa a la legisladora demandante.**[46] (Énfasis suplido).

**Se reiteró la normativa sentada en el caso previo a los efectos de que un legislador** *no* **podrá acreditar su legitimación activa con sólo alegar que sus prerrogativas legislativas se veían afectadas por no permitírsele fiscalizar adecuadamente la obra legislativa y se indicó que esta función fiscalizadora sólo envolvía "los mecanismos razonables y necesarios que [hicieran] viabl[e] su participación plena en todas las etapas críticas del proceso legislativo".** *Hernández Torres v. Hernández Colón et al.,* **ante, pág. 602. Conforme a ello, se concluyó que no se le estaba causando un daño claro e inmediato a las prerrogativas legislativas de la demandante; que ésta no estaba privada de ejercer su voto en contra de aquella legislación que a su juicio fuera perjudicial para el País ni de convencer a los demás legisladores de los defectos de tal legislación. Por lo que la demandante no podía trasladar al foro judicial su intento fallido en el proceso legislativo válido en aras de ser allí victoriosa debido a que ello tendría el efecto de trastocar la separación de poderes de nuestra Isla. Íd., pág. 604.** *Dichas decisiones*

---

[46] Se señaló que para que un legislador ostente legitimación activa en un pleito deberá: **(1) demostrar que ha sufrido un daño claro e inmediato a sus prerrogativas legislativas; (2) demostrar que no se trata de prerrogativas abstractas ajenas al ejercicio de sus funciones legislativas sino, más bien, aquellas prerrogativas que tiene todo legislador a ejercitar plenamente su derecho constitucional a legislar según dispuesto por la Sec. 1 del Art. III de nuestra Constitución, L.P.R.A., Tomo 1, y (3) probar la conexión entre el daño sufrido y la acción que pretende ejercitar, no pudiendo basar sus alegaciones en que acude al tribunal en representación de sus constituyentes para vindicar un interés general.** *Hernández Torres v. Hernández Colón et al.,* **[131 D.P.R. 593, 600-601 (1992)].** (Énfasis suplido).

***constituyen la norma imperante en esta jurisdicción***. (Énfasis suplido).

En <u>Noriega Rodríguez v. Jarabo</u>, [47] en el 1994, éste Tribunal reconoció legitimación activa a dos(2) legisladores de minoría para impugnar la entonces vigente Regla XXXIII, incisos 5-6 del Reglamento de la Cámara de Representantes, 1982, página 1, que requería el consentimiento mayoritario del Cuerpo para que un legislador pudiera abstenerse de votar en un asunto,[48], por

alegadamente violarse sus prerrogativas y funciones legislativas, protegidas por la Constitución de Puerto Rico. Allí concluimos que la Constitución de Puerto Rico no crea derechos de rango constitucional a favor de la abstención de los legisladores en la votación de los proyectos de ley. Concluimos, además, que la abstención en las votaciones legislativas es una materia regulada por las normas de derecho parlamentario y por las reglas internas de cada

---

[47] 136 D.P.R. 497 (1994).

[48] La Regla XXXIII, incisos 5 y 6 del Reglamento de la Cámara de Representantes, 1982, págs. 72-73, dispone:

> 5. Todo representante estará obligado a emitir su voto en los asuntos sometidos a votación y si tiene en ellos interés personal directo deberá abstenerse de votar. **Podrá abstenerse con el consentimiento mayoritario de la Cámara, por razones de alta trascendencia moral o cuando no esté preparado, por desconocimiento del asunto en discusión, para emitir su voto.**
>
> 6. La Cámara a solicitud de cualquier Representante, resolverá sin debate cuándo una cuestión debe ser considerada de alta trascendencia moral, una vez explicada ésta por el Representante. (Énfasis suplido).

Cuerpo legislativo. Expresamos que, la sabiduría, la eficiencia o la justicia de las reglas parlamentarias de las Cámaras Legislativas de Puerto Rico no son materia para juzgarse por los tribunales si no se han violado prerrogativas y funciones de los legisladores, protegidas por la Constitución de Puerto Rico, ni existe infracción constitucional alguna.

Este Tribunal se ha expresado ampliamente, a través de los años, sobre el tema de la legitimación activa de los legisladores. En Hernández Torres v. Gobernador, 129 D.P.R. 824 (1992), de aquí en adelante Hernández Torres I, y en Hernández Torres v. Hernández Colón, 131 D.P.R. 593 (1992), de aquí en adelante Hernández Torres II, este Tribunal, en el año 1992, adoptó una doctrina de legitimación activa aplicada a los legisladores, que resultó diferente al criterio que había aplicado en época reciente y anterior a ese año. En el caso de Hernández Torres I este Tribunal no reconoció legitimación activa a legisladores de minoría en la Cámara de Representantes para impugnar ante el Tribunal de Primera Instancia, mediante un procedimiento de sentencia declaratoria e injunction permanente, la presunción de validez de la Resolución Conjunta de Presupuesto de Mejoras Capitales y Gastos de funcionamiento del Estado Libre Asociado de Puerto Rico para el año fiscal 1991-1992, Resolución Núm. 163 de 10 de agosto de 1991, aprobado por la mayoría parlamentaria de ese Cuerpo. Los legisladores de minoría plantearon ante el Tribunal de Primera Instancia que

tal actuación de la mayoría parlamentaria era inconstitucional por crear un presupuesto deficitario al momento de su aprobación.  En Hernández Torres II este Tribunal no reconoció legitimación activa a legisladores de minoría para impugnar la presunción de validez de la Ley Núm. 58 de 16 de agosto de 1989 mediante la cual se creó el Departamento de Asuntos de la Comunidad Puertorriqueña, [49] para prestar servicios a los puertorriqueños domiciliados en el estado de Nueva York.  Dicha agencia, a la cual se le asignaban fondos públicos, estaba destinada a "...ayudar a la comunidad puertorriqueña que vive y se desempeña en los Estados Unidos, incluyendo a

los trabajadores agrícolas inmigrantes, en su lucha por alcanzar la calidad de vida material y espiritual que le dignifique y enorgullezca... así como el fortalecer los mecanismos que le habrán de permitir procurarse ella misma los medios para la convivencia digna en aquel medio social".  Los casos de Hernández Torres I y II dieron margen a la formulación de una doctrina de legitimación activa que no existía previamente. En el 1994, este Tribunal emitió las decisiones en Noriega Rodríguez v. Hernández Colón, *supra,* y en Noriega Rodríguez v. Jarabo, *supra*.  Escasamente dos (2) años después, este Tribunal puso a prueba, en esos casos, la norma sentada en Hernández Torres I y II.  En Noriega Rodríguez v. Hernández Colón, *supra,* el pleito surgió como

---

[49] Derogada por la Ley Núm. 6 del 15 de abril de 1993, puesta en vigor el 1 de julio de dicho año.

consecuencia de la negativa del entonces Gobernador de Puerto Rico de permitir, por ser su prerrogativa, el desembolso de los fondos del "barril de tocino", según dispuesto en Resoluciones Conjuntas aprobadas, a esos efectos. Los legisladores de mayoría de la Cámara de Representantes de Puerto Rico, del mismo partido político del entonces Gobernador, presentaron un recurso de mandamus contra el Gobernador y contra la Administración de Servicios Municipales, agencia del ejecutivo encargada de los fondos del "barril de tocino". Por otro lado, el Representante a la Cámara, Honorable David Noriega Rodríguez, miembro de uno de los partidos de minoría, aunque había votado a favor de una de las resoluciones aprobadas en ambas Cámaras, en acción separada impugnó la validez constitucional de ambas. Este Tribunal resolvió, a tenor con <u>Hernández Torres I y II</u> que el legislador de minoría, Honorable David Noriega, carecía de legitimación activa, porque no demostró haber sufrido un daño claro y palpable a sus prerrogativas y funciones legislativas. Resolvió que los legisladores de mayoría, Representantes a la Cámara por Distrito, tenían legitimación activa porque eran beneficiarios o receptores de esos fondos, a tenor con **la ley**, y mediante su desembolso adelantaban la obra de sus distritos. Este Tribunal concluyó, que la actuación del entonces Gobernador les había causado a los referidos legisladores grave daño a sus prerrogativas legislativas al no permitirles adjudicar los fondos que **por ley** les correspondía distribuir.

¿Tiene el Honorable Héctor Ferrer Ríos, portavoz de la minoría parlamentaria por el Partido Popular Democrático legitimación activa para presentar el recurso de mandamus ante nos?  Contestamos dicha interrogante en la negativa. El portavoz de la minoría del P.P.D. no ha establecido ni acreditado en ninguno de los alegatos presentados ante nos, ni ha demostrado en forma alguna que la actuación de la Cámara de Representantes le haya limitado, infringido o violentado sus prerrogativas y funciones legislativas, constitucionalmente protegidas.  Lo que si ha quedado ampliamente demostrado es que este legislador no utilizó los mecanismos que tenía disponibles en el Reglamento de la Cámara de Representantes y en el Manual de Procedimiento Parlamentario para traer su planteamiento a la consideración del Cuerpo. Ese era el foro constitucionalmente autorizado para resolverlo, mediante apelación.[50]

---

[50] La sección 42.5 de la Regla 42 del Reglamento de la Cámara de Representantes, la cual reconoce el derecho de apelación al Cuerpo, dispone lo siguiente:

> **Los Representantes tienen derecho a apelar ante la Cámara las decisiones del Presidente en cuanto a cuestiones de orden. La apelación será planteada por el Representante que hiciere el planteamiento de orden inmediatamente se conozca la decisión.**
>
> Al solicitarse la apelación, a menos que la Cámara decida otra cosa, el Presidente podrá conceder un turno a favor y uno en contra, de cinco (5) minutos cada uno, para que los Representantes se expresen sobre la misma. La apelación se resolverá por

**(Continúa . . .)**

## LEGITIMACIÓN ACTIVA DE UN LITIGANTE PARA RECLAMAR DERECHOS DE TERCEROS

Un litigante no puede, como regla general, impugnar la constitucionalidad de una ley, reglamento o actuación gubernamental aduciendo que la misma infringe los derechos constitucionales de terceras personas. Se ha reconocido, como excepción, a un litigante su facultad de reclamar los derechos constitucionales de terceros, cuando concurren ciertas y determinadas circunstancias.[51]

Al determinar sobre la legitimación activa de un litigante para cuestionar la constitucionalidad de una ley, reglamento, o de una actuación administrativa, al amparo de los derechos de terceras personas, un tribunal deberá quedar satisfecho plenamente de que dicho litigante cumple con los cuatro (4) elementos o factores siguientes: **(a) el interés del litigante; (b) la naturaleza del derecho invocado; (c) la relación existente entre el litigante y las terceras personas; y, (d) la factibilidad de que los terceros puedan hacer valer tales derechos en una acción independiente.**[52]

¿Tiene el Honorable Aníbal Acevedo Vilá, Gobernador de Puerto Rico, la señora Marisara Pont Marchese y el Honorable

---

mayoría de los Representantes presentes. (Énfasis suplido).

Sobre el derecho a apelar las decisiones del presidente del cuerpo deliberativo con respecto a las cuestiones de orden, véase, además, Mason, op. cit., págs. 179-84.

[51] Col. Ópticos de Puerto Rico v. Vani Visual Center, 124, D.P.R. 559, 565 (1989); Zachry International v. Tribunal Superior, 104 D.P.R. 267, 271 (1975).

[52] Íd.

Héctor Ferrer Ríos, portavoz de la minoría parlamentaria en la Cámara de Representantes, por el Partido Popular Democrático, legitimación activa, como litigantes, para reclamar los derechos y prerrogativas legislativas del Honorable Francisco González y el Honorable Bernardo Vázquez, ambos legisladores de mayoría por el Partido Nuevo Progresista en dicho Cuerpo? La contestación es en la negativa. El interés de los peticionarios, como litigantes ante este Foro, no es legítimo ni constitucionalmente válido. El interés del Gobernador de Puerto Rico y la señora Pont Marchese se reduce y reside en prevalecer sobre la mayoría parlamentaria en ese Cuerpo en una pugna que surge del ejercicio del Primer Ejecutivo de su **"poder de nominación"** y el ejercicio de ese Cuerpo legislativo de su **"poder de consejo y consentimiento"**. El interés del Honorable Héctor Ferrer Ríos se reduce y reside en prevalecer sobre la decisión de la mayoría parlamentaria de no consentir, en reconsideración, a la nominación de la señora Pont Marchese como Secretaria de Estado, planteando la violación a los referidos dos (2) legisladores de mayoría de sus alegadas prerrogativas legislativas.

La naturaleza del derecho invocado por los peticionarios reside, fundamentalmente, en las alegadas prerrogativas y funciones legislativas de los referidos dos (2) legisladores de mayoría, que no reclamaron oportunamente ningún remedio al Cuerpo, mediante los mecanismos reglamentarios

disponibles. No existe relación vinculante alguna entre los peticionarios, como litigantes, y los referidos dos (2) legisladores de mayoría, para que puedan reclamar ante este Tribunal sus derechos y prerrogativas. Ellos son los únicos que pueden reclamar oportunamente sus prerrogativas legislativas ante el foro legislativo; y aquellas otras protegidas constitucionalmente ante los Tribunales, bajo la doctrina de legitimación activa de legisladores adoptada por este Tribunal en <u>Hernández Torres I y II</u>.

V

El asunto ante nos, como mucha de la litigación reciente en Puerto Rico, tiene su génesis en las pugnas entre las élites que gobiernan y ejercen el poder político en las ramas políticas, o entre sectores de una misma élite. El creciente número de casos, sobre estos temas, presentados ante este Tribunal demuestran claramente que la litigación se considera por algunos sectores políticos, y de otra índole, en el país como un método eficaz para adelantar sus causas. Los beneficios que se derivan de éstos litigios por quienes no son las partes ni sus abogados, es decir, el pueblo en general son muy difíciles de estimar.

Estamos conforme con el resultado, a que llega el Tribunal, de denegar al auto de mandamus solicitado. Estamos, además, conforme con los fundamentos utilizados para sostener tal denegatoria. No obstante, no estamos conforme con el curso de acción y los fundamentos utilizados para atender separadamente el asunto de la

validez de los actos de la Cámara de Representantes, por entender que son parte integral del criterio y fundamentos que tienen que ser utilizados para sostener la denegatoria al auto de mandamus solicitado. Por lo que concurrimos con relación a esa última parte de la Opinión del Tribunal.


Efraín E. Rivera Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Aníbal Acevedo Vilá
y Otros

    Peticionarios

        vs.                  MD-2005-4     Mandamus

José E. Meléndez Ortiz

    Recurrido

Opinión Disidente emitida por el Juez Asociado señor Fuster Berlingeri.

San Juan, Puerto Rico, a 7 de junio de 2005.

Una mayoría del Tribunal deniega el mandamus solicitado en el presente caso, y lo hace por dos razones, **ninguna de las cuales se refiere al asunto medular planteado ante nos**.

La controversia substantiva que dio lugar a este caso es sencilla: **<u>¿qué voto se requiere en la Cámara de Representantes para confirmar a la persona que el Gobernador de Puerto Rico ha nombrado a la Secretaría de Estado</u>?**

La mayoría del Tribunal **<u>elude</u>** contestar la referida controversia amparándose en dos fundamentos. El primero de ellos es que las partes peticionarias no tienen **legitimación activa** ("standing") para traer dicha controversia ante nuestra consideración. En términos sencillos, esto quiere decir que la mayoría

del Tribunal entiende que ninguno de los peticionarios tiene suficiente interés en la controversia aludida como para solicitar la intervención de este Tribunal.

Yo debo disentir enfáticamente de este primer fundamento. Para mí al menos el Gobernador de Puerto Rico tiene clara legitimación activa en este caso. El Gobernador tiene un interés muy particular en escoger y nombrar a la persona que es el colaborador de más jerarquía de su gobierno; la persona que por mandato constitucional lo sustituye como Gobernador en las situaciones correspondientes. **El Gobernador ciertamente tiene un gran interés en que el proceso de confirmación por la Cámara de Representantes de su principal Secretario se realice debidamente.** La acción del Presidente de la Cámara de Representantes, que aquí se impugna como errónea, menoscaba la autoridad del Gobernador para escoger al Secretario de Estado de su preferencia, ya que tal autoridad apareja que el proceso de confirmación se realice debidamente. Por ello, el Gobernador sufre un daño específico cuando su nombramiento es rechazado mediante un proceso errado. El Gobernador, pues, tiene plena capacidad para invocar la protección judicial en el caso de autos. Véase, <u>Warth v. Seldin</u>, 422 US 490 (1975).

Nótese que el caso de autos apareja precisamente un conflicto entre el interés del Gobernador en que se confirme la persona que nombró al cargo de Secretario de Estado y la decisión del Presidente de la Cámara de Representantes de que ese nombramiento no obtuvo votos suficientes para la

confirmación. La controversia trabada es entre el Gobernador y el Presidente de la Cámara de Representantes como protagonistas centrales de la cuestión ante nos. Por así decirlo, ellos son los dos contendientes reales en esta pugna. Por eso no tiene sentido para mí que este Tribunal, que es el arbitro en dicha controversia, resuelva que uno de los dos contendientes de ella no tiene legitimación activa. **¿Cómo es posible que se pueda considerar que no tiene interés suficiente en la controversia precisamente uno de los dos contendientes de ella?**

El otro fundamento de la decisión de la mayoría del Tribunal en este caso es igualmente problemático. Según la mayoría del Tribunal, no procede el mandamus solicitado porque el nombramiento en cuestión fue rechazado al obtener en reconsideración 20 votos a favor y 22 votos en contra. **Este fundamento constituye un falaz argumento circular.** En el presente caso, los peticionarios están cuestionando precisamente si es válido el voto de reconsideración supuestamente adverso. Por ende, no puede denegarse su planteamiento meramente reiterando que hubo un voto de reconsideración adverso. La cuestión de si tal reconsideración fue válida, no puede resolverse afirmando que hubo una reconsideración. Ello no es fundamento alguno.

En resumen, las dos razones específicas en que se apoya la mayoría del Tribunal para denegar el recurso solicitado por los peticionarios son inadecuadas y defectuosas en lo que a mí concierne, por lo que no puedo suscribir la decisión del

Tribunal de ningún modo. Sin embargo, en el fondo del dictamen mayoritario hay una consideración de gran peso que amerita ponderación. Veamos.

## II

La doctrina de separación de poderes requiere sin lugar a duda alguna que este Foro se mueva **con pies de plomo** cuando tiene ante sí una cuestión relativa a una decisión legislativa sobre las reglas y procedimientos de la Rama Legislativa. En virtud del amplio poder que le otorga la Sección 4 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico a cada cámara legislativa para adoptar las reglas para sus propios procedimientos y gobierno interno, **"debemos actuar con mesura, respetando el criterio de otros cuerpos gubernamentales sobre la extensión de sus propios poderes"**. <u>Noriega Rodríguez v. Jarabo</u>, 136 D.P.R. 497, 516 (1994). Evidentemente, la **norma de gran circunspección judicial** que hemos reconocido antes en casos parecidos al de autos ha pesado mucho en la decisión mayoritaria aquí.

Sin embargo, si penetramos al fondo de la particular disputa ante nos, me parece claro que no estamos realmente en una situación que requiera nuestra abstención de intervenir o nuestra anuencia a la decisión impugnada.

Nótese, en primer lugar, que nuestra clara doctrina aplicable aquí es la de deferencia judicial a la facultad decisoria legislativa **<u>excepto cuando es menester que se</u>**

**determine con finalidad la norma constitucional que rige el asunto concreto**. La norma de deferencia judicial referida parte de la premisa de que **"al ejercer su función de reglamentar, la Asamblea Legislativa no puede obviar e ignorar las limitaciones constitucionales."** Silva v. Hernández Agosto, *supra*, pág. 56. Por ello, al señalar antes los contornos de la separación de poderes entre las tres ramas de gobierno, claramente pautamos también que:

> ". . . **cuando haya conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales interven[drán] con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias.**" Id. pág. 57.

En el caso de autos, existe cuando menos una fundamental diferencia de criterio sobre el asunto medular de si la confirmación por la Cámara de Representantes de la Secretaria de Estado nominada por el Gobernador requiere un voto de mayoría absoluta. **Resolver con finalidad tal diferencia de criterio es "función ineludible" de este Foro** y hacerlo **"no constituye una indebida intromisión en los trabajos de la Rama Legislativa"**. Silva v. Hernández Agosto, *supra*, pág. 57. Desde hace varias décadas ya, ha sido la firme doctrina constitucional en Puerto Rico que son los tribunales los que tienen la responsabilidad **que no se puede evadir "de interpretar el derecho en casos de conflicto entre las ramas gubernamentales, ya que éstas no pueden convertirse en árbitros de sus propios actos"** Noriega Rodríguez v. Jarabo, 136 D.P.R. 497, 516 (1994); Peña Clós v. Cartagena Ortiz, 114 D.P.R. 576, 591 (1983); P.S.P v. E.L.A., 107 D.P.R. 590, 596

(1978); Santa Aponte v. Srio. del Senado, 105 D.P.R. 750, 759 (1977).

Debe notarse que con respecto al asunto de la presente disputa entre el Gobernador y el Presidente de la Cámara de Representantes, no hay ninguna norma constitucional, estatutaria o reglamentaria que directa y expresamente resuelva esta importante disputa. Existe, pues, una **laguna jurídica**, que ha provocado una fundamental diferencia de criterio entre la cabeza de la Rama Ejecutiva y la cabeza de una de las cámaras de la Rama Legislativa. **El único Foro que puede resolver jurídicamente esa diferencia de criterio con finalidad es este Tribunal, y hacerlo constituye insoslayablemente una de nuestras funciones principales.** Por eso no puede considerarse de ningún modo que la doctrina de separación de poderes nos requiere dar deferencia al criterio del Presidente de la Cámara, aunque el asunto trate sobre una facultad propia del cuerpo que preside. **Sencillamente, el Presidente de la Cámara de Representantes no puede obviar o ignorar las limitaciones jurídicas que puedan existir aun sobre los poderes de gobierno interno de su Cámara.** Y es al Tribunal Supremo a quien le corresponde aclarar los contornos de tales poderes. Noriega Rodríguez v. Jarabo, *supra*, pág. 517.

Por otro lado, debe destacarse que en el caso de autos, existe un conflicto jurídico no sólo entre el Gobernador y Presidente de la Cámara de Representantes sino **además entre los**

**adláteres de éste último y otro grupo bipartita de miembros del cuerpo legislativo que él preside**. Entre los propios representantes que integran la Cámara existe una honda división sobre el asunto que aquí nos concierne, por lo que el sector que ha comparecido como parte recurrida aquí difícilmente puede invocar para sí la deferencia a su postura que le corresponde a la Rama Legislativa como tal. **En otras palabras, nos toca decidir el conflicto jurídico entre dos grupos de representantes, sin que ninguno de ellos pueda reclamar que su particular interpretación merece más deferencia judicial que la otra**. Evidentemente la doctrina de separación de poderes alude a las relaciones entre las **<u>ramas de gobierno</u>**. Las deferencias y abstenciones de intervenir que puedan derivarse de sus esenciales principios de respeto mutuo y reciprocidad, atañen a las ramas propiamente. No aplican ni pueden invocarse cuando el asunto trata de un conflicto *intra-rama*, como es en gran medida el que aquí nos concierne. Nótese que ni siquiera en la reconsideración del voto de confirmación impugnado ante nos la parte recurrida obtuvo la mayoría de los votos de los 51 miembros de la Cámara de Representantes. La supuesta reconsideración con voto de 22-20 delata una honda división en una de las dos cámaras de la Asamblea Legislativa, por lo que ninguno de esos dos grupos de legisladores de la Cámara de Representantes puede reclamar, frente al otro grupo, que su criterio está protegido por una supuesta inmunidad que nace de la doctrina de separación de poderes.

En resumen, pues, el caso de autos presenta una controversia de índole constitucional de las que le compete resolver con finalidad precisamente a este Foro. Se trata de un asunto que no podemos soslayar sin menoscabar a la vez nuestro rol fundamental de ser el interprete final de la Constitución y nuestra importante función de definir los contornos de las facultades respectivas del Poder Legislativo y el Poder Ejecutivo y de determinar la validez de sus actos, Santa Aponte v. Srio. del Senado, *supra.* Es por todo lo anterior que estimo que la mayoría de este Tribunal ha errado al soslayar resolver la controversia de fondo presente en este caso.

III

Para concluir, debo expresar mi criterio sobre lo que debió resolverse en este caso, considerado en sus méritos.

La norma que aquí nos concierne de modo medular, que dispone cuál votación es necesaria para la confirmación de un Secretario de Estado—mayoría absoluta o simple—no está directamente consignada en la Constitución del E.L.A., pero mediante conocidos principios de hermenéutica, puede establecerse con certeza. Veamos.

Los que redactaron nuestra ley fundamental conocían a cabalidad **la confirmación legislativa de un nombramiento del Gobernador por mayoría absoluta de votos**. La dispusieron así expresamente para la confirmación de la persona que el Gobernador nombre al cargo de Contralor, en la Sección 22 del Art. III de la

Constitución. De modo expreso también dispusieron en la Sección 9 del Art. IV de ésta que se elegiría **"por mayoría del número total de los miembros que componen cada cámara"** al sucesor del Gobernador en casos de vacante cuando tampoco hubiese un Secretario de Estado. Más aun, en las discusiones en la Convención Constituyente, uno de sus miembros más prominentes, el Procurador General de Puerto Rico Víctor Gutiérrez Franqui, llegó a proponer que el Secretario de Estado fuese confirmado por mayoría absoluta de ambas cámaras legislativas (Véase, 3 Diario de Sesiones de la Convención Constituyente pág. 2312, Equity, 1961).

Sin embargo, a pesar de todo lo anterior, al configurarse el cargo de Secretario de Estado en la Constitución y ordenarse en la Sección 5 del Art. IV de ésta que tal Secretario debía ser confirmado tanto por el Senado como por la Cámara de Representantes, **no se dispuso que su confirmación sería por mayoría absoluta**. A pesar de que tal confirmación se propuso, y a pesar de que tal confirmación o voto se dispuso para otros cargos, **no se adoptó para el de Secretario de Estado**. Evidentemente prevaleció en la Convención Constituyente la idea de que no debía hacerse una excepción con respecto al voto necesario para la confirmación del Secretario de Estado, por lo que este cargo debía ser tratado, como mencionó un miembro de la Convención Constituyente, el señor Iriarte, **"como los demás secretarios del gobierno"**. (3 Diario de Sesiones, *supra*, pág. 2316). El historial referido, y el hecho contundente de que el propio

texto constitucional no dispone un voto de mayoría absoluta para la confirmación de los nombrados a este cargo, pero sí lo dispone para otras posiciones, constituye prueba clara de que no hay requisito constitucional alguno de que el cargo de Secretario de Estado requiere confirmación por mayoría absoluta de los miembros de la Cámara de Representantes.

Con arreglo a lo anterior, es evidente que el Presidente de la Cámara de Representantes **no tenía fundamento constitucional alguno** para decidir como decidió el 9 de mayo de 2005 que la votación de 24 a favor y 16 en contra para la confirmación de Marisara Pont como Secretaria de Estado no era suficiente, porque se requería un voto de mayoría absoluta; es decir, 26 votos a favor. Como la Constitución no establece tal requisito, ni lo hace ley o reglamento alguno, la decisión referida fue **errónea**, y así debería resolverlo este Tribunal. La señora Pont recibió votos suficientes para ser confirmada, por lo que este Tribunal debería ordenarle al Secretario de la Cámara que emita la resolución correspondiente.

Es cierto que el 9 de mayo de 2005, hubo una votación posterior, en reconsideración, en la que alegadamente la confirmación referida fue rechazada. Pero tal votación en reconsideración estuvo tan plagada de irregularidades **que desde el punto de vista jurídico no puede estimarse razonablemente que fue una reconsideración eficaz**. Nótese, en primer lugar, que dicha reconsideración fue realizada al amparo de la errónea premisa de que en la votación anterior no se había confirmado a la designada

Secretaria de Estado por no contar ésta con una mayoría absoluta. **El móvil mismo para realizar la reconsideración aludida fue erróneo**.

En segundo lugar, existe una disputa seria sobre cuál fue la votación real en dicha reconsideración. La parte recurrida alega, en esencia, que la votación fue registrada como 20 votos a favor de la confirmación y 22 votos en contra. Sin embargo, **la propia parte recurrida admite que dos miembros del mismo partido del Presidente de la Cámara expresaron en el hemiciclo después de la votación referida que su intención había sido votar a favor de la confirmación de la señora Pont, y no en contra como fue contado su voto**. Así que es evidente que el verdadero resultado de la votación en reconsideración fue de **22 votos a favor y 20 en contra**, aunque no fue registrado así. **Se trata de otra enorme irregularidad**, que debemos repudiar aunque los legisladores en cuestión no hayan comparecido ante nos, ya que la propia parte recurrida, como la recurrente, admite lo acontecido.

Finalmente, también se ha cuestionado si la reconsideración aludida fue procesalmente válida, en vista de que el legislador que la solicitó aparentemente no tenía facultad para hacerlo según el Reglamento de la Cámara, por no haber sido uno de los que prevalecieron en la votación reconsiderada; y luego, dicho legislador no participó en la reconsideración, que se solicita precisamente cuando uno de la parte prevaleciente desea cambiar su voto. Se alude, pues, a aun otras irregularidades, que invalidan la reconsideración referida.

A la luz de todo lo anterior, **no puede concluirse de ningún modo razonable que fue válido el proceso** mediante el cual se determinó el 9 de mayo de 2005 que la nominada para el cargo de Secretaria de Estado no fue confirmada. La certificación a tales efectos emitida por el Secretario de la  Cámara **no tiene ningún fundamento constitucional válido, y es el producto de una madeja de errores e irregularidades**. Es verdaderamente lamentable y ominoso que una mayoría de este Tribunal le dé su aprobación. **Lo que procedía aquí** era que se pautase el derecho aplicable, se dejara sin efecto la certificación referida, y se ordenase al Secretario de la Cámara de Representantes a emitir una certificación de que la señora Pont había sido confirmada al cargo de Secretaria de Estado. De otro modo, lo sucedido el 9 de mayo de 2005 pasará a la historia como **una actuación carente de legitimidad,** avalada aun así por una mayoría de este Tribunal.

Como no estoy conforme con este proceder judicial, yo DISIENTO.


                                        Jaime B. Fuster Berlingeri
                                             Juez Asociado